[Civ. No. 21020. First Dist., Div. One. Oct. 17, 1963.]

CUTTER LABORATORIES, INC., Plaintiff and Respondent, v. CHARLES M. TWINING, et al. Defendants and Appellants.

Leonard, Dole & Formichelli and George F. Duke for Defendants and Appellants.

Girvan Peck, Morrison, Foerster, Holloway, Clinton & Clark for Plaintiff and Respondent.

BRAY, P. J.—In a declaratory action to determine rights under a stock purchase agreement, defendants appeal from a judgment declaring the agreement binding. Defendants also move this court to take certain evidence and to make certain findings of fact and conclusions of law.

## QUESTIONS PRESENTED.

*A. Main Appeal.*

1. Is the character of the stock divisions involved, and what is the effect of the 1950 supplemental agreement?

2. Is the original agreement void for lack of mutuality?

3. Were the purposes of the contract frustrated?

4. Was the purchase price of the stock inequitably determined?

5. Laches and waiver of right to rescind.

*B. The Motion to Take Evidence and Make Findings.*

A. MAIN APPEAL.

## RECORD.

Charles M. Twining[1] was one of the founders of Cutter Laboratories.[2] He served as vice president from its incorporation in 1907 until he resigned as such in 1946. He was a director until 1959. He owned 3,600 shares of the capital stock. The agreement in question relating to 1,800 shares was entered into by Charles and his wife Edith H. and Cutter on October 15, 1942. On November 11, 1960, Charles and Edith

---

[1] Hereinafter referred to as Charles.
[2] Hereinafter referred to as Cutter.

transferred all their property, including all their rights under the agreement, to their son Fred, in trust for them. May 8, 1961, Fred served on Cutter a notice of rescission of the agreement and the supplemental agreement (hereinafter discussed). Cutter rejected the rescission and brought this action for declaratory relief and enforcement of the agreements. Charles, Edith, and Fred as trustee, answered and cross-complained for rescission. After trial without a jury, the court made the findings and conclusions of law hereinafter described, rendered judgment in favor of plaintiff both on its complaint and defendants' cross-complaint.

## FINDINGS.

The court found that Charles was fully familiar with Cutter's financial affairs from 1907 to 1959; that the original agreement was proposed to both parties by an independent life insurance salesman and drafted by an attorney employed by the latter, and that Cutter executed the agreement at the instance and request of Charles and Edith and as an accomodation to them, without influencing their decision in any respect; that there is no evidence that $20 per share was not then a fair price; and that the consideration for the agreement was adequate and fair. Cutter then was a small drug manufacturer substantially indebted. Charles was fully familiar with the risks as well as the potential growth of the business. In entering into the agreement, the Twinings specifically intended to set aside a portion of their capital in the form of a fixed asset, not subject to the risks of the business and knowingly passed up the opportunity for capital appreciation as to the escrowed stock. In 1944, when the Cutter stock's value exceeded $20 per share, Cutter offered the Twinings an opportunity to rescind the agreement in its entirety. They considered but declined to accept it. The offer was made entirely as an accomodation to the Twinings, and their refusal was freely made, without influence by Cutter. In 1951 when Cutter stock had again materially increased, and was about to be publicly traded for the first time, Cutter offered a modified recission of the agreement, which would have given the Twinings approximately $143,000. They declined the offer without influence by Cutter. In 1946 plaintiff split its stock five shares for one; in 1951, three for one; and in 1955, two for one, with the result that the shares in escrow became 54,000 shares. On each occasion Cutter and the Twinings instructed the escrow holder in writing to include the newly issued shares in the escrow subject to the agree-

ment. In 1950 the Twinings signed a supplemental agreement declaring that all newly issued shares were intended to be subject to the agreement. Thereafter in registration statements and annual reports the newly issued shares were always described as subject to the agreement, all with Charles' knowledge and concurrence. No contention is made that there is not substantial evidence to support the foregoing findings. The court then found that the entire 54,000 shares in escrow were intended to be and are subject to the agreement.

The court further found, and it is not contended that the findings are not supported, that the possibility of a public sale of Cutter stock had been discussed in years prior to 1951 by Charles and the other directors; that when in 1951 public sale was made the Twinings made no claim that the change affected the agreement in any way. On the contrary, Charles freely signed Cutter's registration statements and made no objection to its annual statements in 1951 and thereafter, all of which identified and described the agreement and represented it to Cutter shareholders as still valid and subsisting. There is no evidence that the Twinings ever at any time questioned or expressed dissatisfaction with the agreement, or that they demanded or requested its termination or cancellation until they joined in the answer and counterclaim in this suit. They uniformly treated the agreement as valid and subsisting and accepted all benefits under it over the course of 18 years. There is no evidence that any of the parties have ever mistaken the meaning of the agreement in whole or in part. Cutter has taken out and maintained in force the insurance policy, paying to date $53,000 in premiums, and has paid the Twinings in dividends on the escrow stock approximately $118,000. There is no evidence that any of the payments were made from other than earned surplus. Cutter has in all respects performed each of its obligations under the agreement, and is ready, able and willing to perform its remaining obligations. There is no evidence of any forfeiture or hardship as to any party to the agreement. Its purpose has not been frustrated nor have any material conditions or circumstances changed. The agreement when carried out will give the parties what they intended and what they bargained for.

## EVIDENCE.

Insofar as the findings are findings of fact and not conclusions, defendants do not claim that the findings are not sup-

ported by the evidence. Supplementary to the facts set forth in the findings, the following facts round out the picture of the relationship of the parties during the period involved. Insurance Agent Coombs in recommending the escrow agreement to Cutter, Charles and the other key executives, stated that such an arrangement would insure that on the death of the seller his heirs would not have to look for a purchaser and would get an adequate price for the stock; further, that the heirs would receive the purchase price free from inheritance taxes and probate expenses. Cutter stock was then unlisted and there was no trading in it. Its book value was approximately $35 per share. The corporation had then been selling stock to employees at $20 per share. The agreement stated that the parties mutually desired that the 1,800 shares belonging to Charles and Edith be surrendered to the corporation as treasury stock upon Charles' death, at the rate of $20 per share. The stock was to be endorsed and immediately placed in escrow with the American Trust Company, to be held until the death of Charles and then turned over to the corporation. "Such escrow instructions shall be irrevocable, except by mutual consent of the parties hereto, unless the corporation shall fail to maintain the insurance policy or policies provided for" in the agreement. The corporation was to deliver to the escrow holder a policy or policies of life insurance on Charles' life aggregating $36,000, such policy or policies to be beneficially owned by the corporation. "The corporation shall in the absence of express provision to the contrary be charged with the duty of maintaining such policy or policies in full force and effect. . . ." "The escrow hereinabove mentioned shall be for the sole purpose of insuring the surrender of the stock to the corporation contemporaneously with the death of Charles M. Twining, and second parties shall retain unimpaired all rights not inconsistent with that purpose, including all voting privileges pertaining to the stock and the right to dividends declared thereon, until the happening of the death of Charles M. Twining."

The supplemental agreement entered into in 1950 stated that it was entered into for the purpose of clarifying the original agreement. Pertinent here is the following: ". . . it is the mutual desire of the corporation and of Charles M. Twining and Edith H. Twining that all of said shares, or such other shares as said shares may have been or be reclassified into, together with any shares received as a stock dividend thereon, (such original stock, reclassified stock and stock

received by way of stock dividend being hereinafter referred to as the 'stock') be surrendered to the corporation as treasury stock upon the death of Charles M. Twining for a total consideration of $36,000;...''

This agreement was intended to operate retroactively and was entered into at the instance of Cutter. In 1951, just prior to the first public sale of Cutter stock, Cutter offered a modified rescission of the agreement calling attention to the fact that the company was about to make a three for one stock split. In Cutter's modified offer of rescission made in 1951 Cutter stated that its proposal ''is designed to change the terms of an agreement that is a very desirable one for the company and which has now proven to be a poor one for you, and we are trying to change its terms in a way that will be beneficial to you.'' Charles refused this offer. The split was made.[3]

Charles, Edith and Cutter signed a letter to the escrow holder instructing it to surrender the 1,800 shares in exchange for new stock on the basis of three for one. The letter also stated that it was understood that in 1946 the 1,800 shares were ''reclassified'' to a total of 9,000 shares, and that the 9,000 shares ''presently involved will become 27,000 shares under the three for one exchange arrangement.'' ''The certificates for the new stock are to be held by you subject to the same terms and conditions as those originally deposited.''

In 1955 Cutter took action reclassifying its stock, exchanging two shares for one. The court called this a stock split. The shares in escrow then became a total of 54,000, having a value at the time of trial of approximately $800,000.

The notice of rescission given by Fred as trustee is based upon the claim that the purpose of the agreement had been frustrated and that enforcement of the agreement would create a forfeiture.

### 1. THE STOCK DIVISIONS AND THE 1950 SUPPLEMENTAL AGREEMENT.

Defendants contend that the stock divisions made by Cutter belong to the Twinings because of the clause in the agreement to the effect that they ''shall retain unimpaired all rights not inconsistent'' with the purpose of the escrow ''and the right to dividends declared thereon'' (that is, on the escrowed stock). They further argue that the 1950 supplemental agreement which states, in effect, that it was the intent

---

[3]It is conceded that this was a stock split and not a stock dividend.

of the parties that all stock divisions be included in the escrow, is void for lack of consideration, and hence the original agreement alone can be looked at to determine the issue with respect to the stock divisions.

 It is conceded that no new consideration was given for the supplemental agreement. Whether that fact makes the agreement void for purposes of enforcement depends upon whether the supplemental agreement is merely explanatory of the first agreement or whether it is a modification of that agreement. If merely explanatory, the original consideration would support the supplemental agreement. If a modification, then in order for the supplemental agreement to be valid there would have had to be an additional consideration. (See *Main St. etc. R.R. Co.* v. *Los Angeles Traction Co.* (1900) 129 Cal. 301 [61 P. 937].) However, we are not required under the circumstances of this case to determine this question, for the reason that the parties themselves have interpreted the original agreement and, assuming the supplemental agreement to be void insofar as any right of action to enforce it is concerned, it nevertheless may be considered as an act of the parties to be considered with their other acts in evidencing their intent and their interpretation of the original agreement. For the same reason it is unnecessary for us to determine whether the stock divisions were "stock dividends" or "stock splits." Whichever they be, and whether a strictly legal definition of the word "dividends" in the original agreement would include or exclude either or both, the parties themselves determined that it did include both.

 The trial court's findings stated that the stock was "split." It is not clear whether this was intended to be a determination as to whether the divisions were splits or dividends. This fact is immaterial. As found by the court, the parties themselves experienced no difficulty in interpreting by their conduct the terms of the agreement. Undeniably for a period of 18 years, the Twinings never once intimated that they had intended any stock divisions not to be subject to the escrow agreement. On all occasions when called upon to act in a manner that required interpretation of the agreement they showed that they understood the agreement to apply to the stock divisions whether they were dividends or splits. It is significant that on the two occasions when Cutter offered rescissions of the agreement, one an outright one, the other a modified one, the Twinings in no way indicated that the intent of the parties was other than to include the stock

divisions, and in refusing the proposed modifications indicated their satisfaction with the agreement as so understood. Nor did they testify in this action that they ever intended the agreement not to include the stock divisions. In fact, Charles testified concerning the agreement, ''I have always expected to keep it until I died.'' When asked if he approved of his son's serving notice of rescission on Cutter, all he said was, ''Well, if it was my son, Fred, I do approve of it because I trust him for everything.'' ■ ''Parties to a contract, in all fairness, should be bound by the construction they themselves have placed upon their agreement, particularly where they have acted thereunder for a considerable period of time.'' (*Standard Iron Works* v. *Globe Jewelry & Loan, Inc.* (1958) 164 Cal.App.2d 108, 118 [330 P.2d 271].)

The evidence shows that the Twinings, from time to time, not only interpreted the contract as covering the stock divisions, but also time after time affirmed the contract in the light of that interpretation. ■ '' '... [I]n all cases where the terms of their contract, or the language they employ, raises a question of doubtful construction, and it appears that the parties themselves have practically interpreted their contract, the courts will follow that practical construction. ■ It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. ■ Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law. . . . The law, however, recognizes the practical construction of a contract as the best evidence of what was intended by its provisions.' '' (*Bohman* v. *Berg* (1960) 54 Cal.2d 787, 795-796 [8 Cal.Rptr. 441, 356 P.2d 185] ; see *Loomis Fruit Growers Assn.* v. *California Fruit Exch.* (1932) 128 Cal.App. 265, 275-276 [16 P.2d 1040].)

### 2. THE ORIGINAL AGREEMENT IS NOT VOID FOR LACK OF MUTUALITY.

■ Defendants next contend that the original agreement gave Cutter merely an option to perform which it could terminate unilaterally. This contention is based upon the follow-

ing language of the agreement: "The corporation shall *in the absence of express provision to the contrary*" (italics added) maintain the insurance policy or policies and pay the premiums thereon. It is then contended that express provisions to the contrary appear in paragraphs 2, 3 and 5. Paragraph 2 provides: "Such escrow instructions shall be irrevocable, except by mutual consent of the parties hereto, unless the corporation shall fail to maintain the insurance policy ..." Subparagraph (3) of paragraph 3 makes the agreement irrevocable except by joint action of the parties "unless the corporation shall have failed to perform its obligations under this agreement." Paragraph 5 states: "In the event any policy of life insurance to be issued hereunder shall lapse for non-payment of premiums on the due date thereof and the corporation shall not reinstate such policy within thirty days thereof ..." the ownership of the policy shall be surrendered to the Twinings and instructions are given to the escrow holder to carry this out. Defendants' interpretation of these provisions of the contract is incorrect.

Preceding in paragraph 3 the language above quoted from subparagraph (3), Cutter's obligations are set forth in mandatory language. Cutter "shall" procure a policy, the payment of the principal of which by the insurance company on Charles' death will discharge the "obligation" of the corporation to pay the purchase price. Cutter is "charged with the duty of maintaining such policy or policies in full force and effect. . . ." Certainly these statements as to Cutter's obligations under the agreement are clear promises to carry them out. The provisions dealing with actions to be taken by the Twinings if Cutter fails to pay the premiums in no way relieves Cutter of its duty to make payment. They simply set out an expeditious way of handling a possible breach on Cutter's part so that the stock will not continue to remain tied up in escrow. The contract is not void for lack of mutuality in this respect.

It is further argued that the agreement lacks mutuality because under California law stock may be repurchased by a corporation only out of surplus and if no surplus were available to pay insurance premiums from time to time the contract would become unenforceable. ■ Except for certain purposes outlined in section 1706, a corporation may repurchase its own shares only out of earned surplus. (Corp. Code, §§ 1705, 1707.) ■ An agreement to purchase shares is valid at the time when made if at that time earned surplus exists,

but may become unenforceable if at the time for performance no surplus exists. (*Goodman* v. *Global Industries* (1947) 80 Cal.App.2d 583, 589 [182 P.2d 300]; *In re Mathews Constr. Co.* (D.C.S.D.Cal. 1954) 120 F.Supp. 818, 821.) However, it follows that such contract is valid if at the time for performance a surplus does exist. Such a surplus did exist at the time of the execution of the contract.

Citing *Topken, Loring & Schwartz* v. *Schwartz* (1928) 249 N.Y. 206 [163 N.E. 735, 66 A.L.R. 1179], defendants contend that any corporate promise to repurchase its own shares is illusory since the corporation controls its own surplus and may reduce it so that at the time for performance none exists out of which to purchase the shares. That case apparently stands for that proposition. However, a later decision by the same court appears to restrict the holding to the situation where no surplus exists at the time the contract is entered into. (*Cross* v. *Beguelin* (1929) 252 N.Y. 262 [169 N.E. 378].) Any other rule would make all corporate contracts of repurchase of shares based on mutual promises unenforceable. That is not the purport of the California statutes.

To evade the problems posed by the *Loring* case, the New York courts have distinguished it in situations exactly like the instant case where repurchase agreements are funded by insurance policies. The courts find the *payment* of the premiums by the corporation sufficient consideration to make the agreement not illusory but enforceable. (*Greater New York Carpet House, Inc.* v. *Herschmann* (1940) 258 App.Div. 649 [17 N.Y.S.2d 483]; *Ionic Shop, Inc.* v. *Rothfeld* (1946) 64 N.Y.S.2d 101; *In re Farah's Estate* (1961) 28 Misc.2d 573 [215 N.Y.S.2d 908].) Defendants state that this rationale may not be applied in California because even an indirect purchase except from surplus is prohibited. (Corp. Code, § 1706.) In our case there is other consideration besides the promise; there is the actual payment of premiums. It is not claimed that these payments were made out of other than earned surplus and the court found that they were. Thus, the agreement is not invalid on this ground.

3. FRUSTRATION.

Defendants contend that because Cutter stock is now publicly sold, the estate tax laws have been changed and the value of the stock has been greatly appreciated, the doctrine of frustration of purpose applies. The elements of that doctrine are as follows: Performance remains possible, but

the *fundamental reason* of *both parties* for entering into the contract has been frustrated by an unanticipated supervening circumstance, thus destroying substantially the value of performance by the party standing on the contract. (See *Lloyd* v. *Murphy* (1944) 25 Cal.2d 48 [153 P.2d 47]; *Dorn* v. *Goetz* (1948) 85 Cal.App.2d 407 [193 P.2d 121]; see also *Gold* v. *Salem Lutheran Home Assn.* (1959) 53 Cal.2d 289 [1 Cal.Rptr. 343, 347 P.2d 687].)

 The doctrine does not apply to the facts of the instant case. Initially, defendants assert that the avoidance of estate tax was one of the major objectives of the contract. The law was changed so that the proceeds of the sale of the stock would no longer be free from tax. Taking it to be true that this tax factor was one of the basic purposes of both parties, still the doctrine of commercial frustration does not apply because "laws or other governmental acts that make performance unprofitable or more difficult or expensive do not excuse the duty to perform a contractual obligation." (*Lloyd* v. *Murphy, supra,* 25 Cal.2d 48, 55.)

In any event, Twining's basic purpose was the protection of his wife in the event of his death, by the creation of an investment of fixed cash value. As found by the court, "Plaintiff in 1942 was a small drug manufacturer engaged heavily in war production and substantially indebted. Defendant Charles M. Twining was fully familiar with the risks as well as the potential growth of the business at that time. In entering into the escrow agreement, the Twinings specifically intended to set aside a portion of their capital in the form of a fixed asset, not subject to the risks of the plaintiff's business, and knowingly passed up the opportunity for capital appreciation as to the escrowed shares." Cutter entered into the agreement to accomodate Twining. Thus, the basic purpose of *both* parties was to protect Twining's wife. That purpose has not been frustrated.

 The court found that the possibility of a public sale had been discussed by Twining with the other directors, that when the sale was made, Twining in no way objected, and that Twining knowingly gave up the possibility of capital gain for a fixed asset. Thus there could be no frustration because of Cutter stock's bringing higher prices on the market.

 It is also urged that the fact that the shares increased greatly in value excuses performance in that it has become unreasonably expensive to the Twinings to be bound by the agreement. The cases relied on hold, on the basic

rationale of impossibility, that performance may be excused where increased expense makes performance impracticable. (*City of Vernon* v. *City of Los Angeles* (1955) 45 Cal.2d 710 [290 P.2d 841]; *Mineral Park Land Co.* v. *Howard* (1916) 172 Cal. 289 [156 P. 458, L.R.A. 1916F 1] Performance here is not impracticable; the "cost" has increased simply because of the speculative nature of the property involved. The rule of frustration never was intended to apply to a contract for the sale of stock, merely because what seemed advantageous to the seller at the time, later turned out to be a bad bargain.

4. PURCHASE PRICE OF STOCK.

Defendants in addition to claims of lack of mutuality and change of circumstances hereinbefore discussed, present a contention based upon what is characterized "the equities" of the case, that the means of determining the purchase price and the price actually fixed are both inequitable.

The court found: "There is no evidence that $20 per share was not a fair price for plaintiff's shares in October 1942, as related to the escrow agreement in suit or otherwise. Other sales of the stock were made shortly before at the same price, and the dividend rate at the time was $1.00 per share. The consideration for the Twinings' agreement was adequate and fair." While defendants suggest that because the book value of the stock was $35 the price was unfair, their major complaint is that the contract set the price "permanently." They say that the contract should have contained a flexible price arrangement and since it did not, the contract should be struck down as being unfair. It requires no citation of authority to say that the courts will not rewrite a contract fairly made and voluntarily entered into. Because the parties failed to put in this provision does not vitiate the contract. The provision simply was contemplated by them.

Defendants, citing 1 Witkin, Summary of California Law, page 282, state that equity will seek to avoid a forfeiture. There is no forfeiture involved in this case. The stock divisions are not being forfeited. They are being sold in accordance with the contract of the parties as the contract was interpreted by them.

5. LACHES AND WAIVER OF RIGHT TO RESCIND.

Based upon the findings hereinafter set forth, the court concluded that defendants did not seek rescission promptly, that they have waived any rights they might have had and that they are barred by laches and estoppel. The court found: "In 1944, when the value of plaintiff's stock

had risen above $20 per share, plaintiff offered the Twinings an opportunity to rescind the escrow agreement in its entirety. They considered the offer but declined to accept it. . . . In 1951, when the value of plaintiff's stock had again materially increased, and when the stock was about to be publicly traded for the first time, plaintiff offered the Twinings a modified rescission of the escrow agreement. . . . Had they accepted this proposal, they would have received approximately $143,000, but they chose to decline it." Both of these offers were made entirely to accomodate the Twinings and they refused freely, without influence by plaintiff. The court further found that until this present action there is no evidence that the Twinings at any time questioned or expressed dissatisfaction with the agreement, or that they requested it to be terminated or cancelled. They treated the agreement as valid and subsisting and accepted all benefits under it for 18 years.

Defendants argue, however, that laches may not be asserted against a legal theory such as lack of mutuality, basing their argument on *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 462 [326 P.2d 484], which holds that laches is not available as a defense to an *action at law,* such as one seeking a money judgment. This, however, is an action for declaratory relief, an equitable proceeding, and as held in *Merigan* v. *Bauer* (1962) 206 Cal.App.2d 616, 619-620 [23 Cal.Rptr. 872], equitable principles are applicable.

Moreover, the question of laches is really not central to the issue of delay. Defendants here sought to rescind. Promptness is a condition of rescission under the statutes, and failure to take action is also held to constitute a waiver of the right to rescind. (Civ. Code, § 1691; *Leeper* v. *Beltrami* (1959) 53 Cal.2d 195, 211 [1 Cal.Rptr. 12, 347 P.2d 12] ; *Estrada* v. *Alvarez* (1952) 38 Cal.2d 386, 391 [240 P.2d 278].) The court's findings with respect to the Twinings' delay justified its holding that the right to rescind had been waived, especially in light of the speculative nature of the property involved. (See *Warfield* v. *Anglo & London Paris Nat. Bank* (1927) 202 Cal. 345, 355-356 [260 P. 881] ; *Neet* v. *Holmes* (1944) 25 Cal.2d 447, 457 [154 P.2d 854].) It is clear, too, that Charles never intended to rescind.

The finding of laches is justified even though defendants argue that no prejudice from the Twinings' delay is shown. It is clear that Cutter could have used the premiums money in other ways, and the stock held in escrow represents

an underlying asset of substantial importance to the corporation and its stockholders. This is true despite the fact that the value of the stock in escrow is not reflected in the balance sheets.

## B. THE MOTION TO TAKE EVIDENCE AND MAKE FINDINGS.

The evidence which defendants desire admitted is a document declared to be a true copy of a "Statement of Consolidated Surplus" of Cutter for 1947, which defendants claim they inadvertently failed to notice was left out of the financial statements for 1947 which were furnished them. Both this evidence, and the requested findings to be made by this court, relate to the question of whether the stock divisions were splits or dividends. As we have hereinbefore shown, this question is not material in view of the interpretation of the agreement by the parties. Therefore, the motion to take evidence and to make findings must be denied.

The motion is denied. The judgment is affirmed.

Sullivan, J., and Molinari, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 11, 1963.