Beverly McCONNELL, Appellant,

v.

ESTATE of W. H. BUTLER et al.,
Appellees.

Oscar STROBEL, Trustee of the Estate of
E. W. Reynolds Company, Appellant,

v.

ESTATE of W. H. BUTLER, Appellee.

Nos. 22188, 22188-A.

United States Court of Appeals
Ninth Circuit.

Oct. 21, 1968.

Beverly McConnell (argued) pro se, Henderson Stockton (argued) of Stockton & Hing, Phoenix, Ariz., for appellants.

Stanley C. Lagerlof (argued) of Burris & Lagerlof, James E. Kendrick, Haskell H. Grodberg (argued), Los Angeles, Cal., Coit I. Hughes, Phoenix, Ariz., for the appellees.

Before BARNES and CARTER, Circuit Judges, and BYRNE,* District Judge.

JAMES M. CARTER, Circuit Judge.

The above appeals were consolidated for argument. They both arose out of the Estate of E. W. Reynolds Company, bankrupt.

## APPEAL BY McCONNELL, ATTORNEY FOR TRUSTEE
### No. 22,188.

No. 22,188, McConnell v. Estate of Butler, is an appeal by McConnell, the attorney for the trustee in the bankruptcy. The appeal is from an order of the district court affirming the referee on a petition for review of an order allowing her fees for legal services.

The sole question presented is whether the findings of the referee were clearly erroneous.

McConnell was appointed counsel for the trustee in bankruptcy on August 5, 1963. On October 4, 1966, on her petition for a fee of $30,000 she was awarded by the referee the sum of $8,000 for her legal services to the trustee. On petition to review the referee's order the district court sustained the referee. We affirm.

The single largest creditor of the E. W. Reynolds estate in bankruptcy was Gladys Reynolds Butler, Executrix of the Estate of W. H. Butler, deceased. Mrs. Butler, in her representative capacity, was a leading objector to the claims of McConnell but not the sole objecting creditor. We are not concerned with the designation of the Estate of Butler as the appellee, since the matter is properly before us.

The E. W. Reynolds Company was adjudicated a bankrupt and in July 1963 a receiver, one Oscar Strobel,[1] was appointed, and McConnell became the attorney for the receiver. McConnell was allowed the sum of $1,500 for her services in that capacity, and this amount is not in issue. On August 5, 1963, Strobel was appointed trustee and McConnell appointed attorney for the trustee.

Certain assets of the estate consisting of merchandise, furniture and fixtures, and the firm name, were sold by the trustee. There remained the accounts receivable, having a face value of $288,-752.93 and scheduled as having a value of $50,000.

The receiver prior to August 5, 1963, collected the sum of $21,356.50. There was a bid at the first meeting of creditors to purchase the remaining accounts receivable for $29,500. McConnell as attorney for the trustee opposed the sale, and the referee authorized the trustee to instead collect the remaining accounts receivable. McConnell's law firm over the past several years, had maintained a collection agency as part of its law offices. McConnell forwarded to different out of state attorneys and collection agencies selected accounts receivable. As a result a gross sum of $26,-600.27 was collected, from which fees and commissions by attorneys and collection agencies totaling $5,107.36 were deducted, netting the estate $21,492.91. These fees and commissions were approved by the referee.

---

* Hon. WILLIAM M. BYRNE, Senior United States District Judge, Central District of California, sitting by designation.

1. On the caption of some of the briefs the name is listed as Stroble. The record shows the name should be Strobel.

The record is bare as to other collections. McConnell states in her brief that through the facilities of her law office and the institution of eleven actions she collected an additional $56,638.85. For the purpose of this opinion we accept her statement. Apparently none of the actions went to trial. Her itemized time records show no time in court in connection with these actions. We assume they were settled.

■ McConnell also claims that she arranged for term deposits with the Bank of Douglas in Phoenix at 4% on funds of the estate, and that the estate had received interest on these funds.[2]

McConnell claims that the allowance by the referee and the affirmance by the district court of $8,000 was not fair and reasonable; that the referee and the district court did not take into consideration prevailing fees or commissions for forwarding of accounts receivable to out of state attorneys and collection agencies; that they did not take into account prevailing fees or commissions for collection of accounts receivable in the district court; that they erred in not awarding McConnell any fee concerning the interest received on estate funds; and that the fee of $8,000 was an abuse of discretion. McConnell relies upon the decision of this court in Jacobowitz v. Double Seven Corporation, 378 F.2d 405 (9 Cir. 1967). Nothing therein is contra to our decision here.

The referee found that "a substantial amount of time and effort of the attorney for the trustee was spent in performing the duties of the trustee in administering the estate." The referee found that approximately 200 hours were expended properly by McConnell as the attorney for the trustee, 165 of which were listed in the petition for fees and the balance expended subsequent to the filing of the petition. Allowance by the referee was on the basis of approximately $40 per hour.

■ No reporter's transcript was supplied by the appellant. Counsel for the objecting creditor represented that a request was made at the hearing before the referee and was denied, and that there was no motion for a continuance. No such motion is shown in the clerk's minutes. It would clearly be the responsibility of the attorney for the trustee or the trustee himself to order and pay for the transcript. This was not done.

■ The findings of the referee, confirmed by the district court, cannot be set aside unless clearly erroneous. Rules 52 (a) and 53(e) F.R.Civ.P., Engelbrecht v. Bowen, 300 F.2d 891 (9 Cir. 1962).

■ We hold that the findings are not clearly erroneous, that the referee did not abuse his discretion in allowing $8,000 as fees, and that the district court properly affirmed the order of the referee.

The judgment in Case No. 22,188 is affirmed.

### APPEAL BY STROBEL— THE TRUSTEE
### No. 22,188–A

This is an appeal by the trustee of the Estate of E. W. Reynolds Company, bankrupt, from an order of the district court, confirming an order of the referee, overruling objections of the trustee and holding that certain creditors who hold debentures should share ratably with general creditors.

### THE QUESTION PRESENTED

Can shareholders of a corporation convert their shares to debentures and claim in the corporate bankruptcy the right to share ratably with general creditors?

### THE FACTS

In October 1956, employees of E. W. Reynolds Company, now the bankrupt,

2. The record is bare as to this matter. McConnell in her petition for fees, states the amount of interest received by the bankruptcy estate was "in excess of $9,500." In her brief she states the amount is $30,600.55.

Compensation for arranging for time deposits of the estate's funds would be nominal and certainly not some percentage of the interest thereafter received.

owned 1615 shares of stock for which the employee stockholders had paid, or eventually paid, $240 per share.

In March 1957, pursuant to California law and permission of the California Division of Corporations, the Reynolds Company offered to exchange debentures of the company for shares of stock owned by its employees. As a result, debentures totaling $244,800 were issued and exchanged for the stock held by the employees. The first installment of interest was payable May 31, 1957, and the debentures matured over a period commencing May 31, 1963, and ending May 31, 1970. Interest was paid through May of 1962. Reynolds Company was unable to and did not make any payments of interest or principal on the debentures in May of 1963 or thereafter.

In October of 1956, at the time of the transaction, the capitalization of the Reynolds Company was adequate, not merely nominal. The employee stockholders had no reason to believe Reynolds Company was insolvent. They had no control over management or fiscal problems of Reynolds Company. The resulting insolvency and bankruptcy of the Reynolds Company was attributable to causes other than the purchase of the stock and the issuance of the debentures. After the exchange, the debenture holders did not participate in the operation, management or ownership of the bankrupt. The debenture holders became the creditors to whose claims Strobel objected.

### THE PROCEEDINGS BELOW

Oscar Strobel, the trustee, filed objections to certain creditors' claims, referred to hereafter as the debenture holders, who are probably additional appellees herein. The objection read as follows: " * * * that for all practical and equitable purposes said debenture claimants represent proprietary rather than creditor interests, said debentures having arisen out of a debenture-stock exchange plan; and that, therefore, they are in the nature of claims of stockholders and can neither legally nor equitably share in dividends of this estate until payment in full of true creditors."

After a hearing before the referee, he made findings of fact and conclusions of law, and an order overruling the trustee's objections and ordering the debenture claims to be *allowed as filed*, that is, as generally unsecured claims on a parity with all other general unsecured creditors' claims in the proceedings.

Petition for review of the referee's order was filed. Neither the trustee Strobel nor McConnell, his attorney, made any arrangements for the preparation or transmittal of a reporter's transcript. The referee prepared his certificate of review and filed it on March 20, 1967. Notice of filing of the certificate was mailed to the trustee.

The matter came up for hearing before the district court on April 7, 1967. Two days before, on April 5, 1967, Strobel mailed to appellees and other interested parties objections to the referee's certificate on review and request for amendments thereto. For the first time, appellant trustee requested therein that "the referee be by order of this Court required to certify a transcript of the evidence or a summary thereof." No arrangements were ever made with respect to the reporter's transcript. If the objections were received the following day, there remained only one day for the referee to prepare a further summary of the lengthy hearing, even if the certificate was not sufficient for this purpose. As a result, no transcript or summary was before the district court other than the referee's certificate on review.

No motion or request for continuance of the hearing before the district court set for April 7, 1967, was made at any time by Strobel or his attorney.

The district court overruled the objections to the referee's certificate and sustained the referee's findings of fact, conclusions of law and order concerning the debenture claims. This appeal followed.

### DISCUSSION

The referee found "There is no evidence that any of the claims of the other

general unsecured creditors of E. W. Reynolds Company were created prior to May of 1957." (Finding XIII).

Although the record is barren as to the names of those "other general unsecured creditors," we know they exist (1) from the reference in Finding XIII and (2) because the trustee objected to the debenture claims being placed on a par with general unsecured creditors.

Absent the reporter's transcript, we must accept the referee's .finding that none of the claims of the "other general unsecured creditors" were created prior to May of 1957 when the debentures came into existence.

■ With regard to a corporation repurchasing its own stock from its shareholders, there are two aspects to be considered. First, for the repurchasing agreement to be *valid* the corporation must have an earned surplus to pay for the stock *at the time when the agreement is made*. In view of our disposition of the case, we do not go further into this factual question.

Second, for the repurchasing agreement to be *enforceable,* the corporation must have an earned surplus *at the time payment is to be made*. Cal.Corp.Code, §§ 1705–1708; Goodman v. Global Industries, 80 Cal.App.2d 583, 182 P.2d 300 (1947); Cutter Laboratories, Inc. v. Twining, 221 Cal.App.2d 302, 34 Cal. Rptr. 317 (1963); In re Mathews Const. Co., 120 F.Supp. 818 (S.D.Cal.1954); In Re Trimble Company, 339 F.2d 838, 843 (3 Cir. 1964), citing In Re Mathews, supra, with approval. The rights of the debenture holders would therefore depend on whether the agreement was enforceable when payment was to be made.

The Court of Appeals, Fifth Circuit, dealt with this question in a bankruptcy context in the case of Robinson v. Wangemann, 75 F.2d 756 (1935). The court stated: "A transaction by which a corporation acquires its own stock from a stockholder for a sum of money is not really a sale. The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case. It is simply a method of distributing a proportion of the assets to the stockholder. The assets of a corporation are the common pledge of its creditors, and stockholders are not entitled to receive any part of them unless creditors are paid in full. When such a transaction is had, regardless of the good faith of the parties, it is essential to its validity that there be sufficient surplus to retire the stock, without prejudice to creditors, *at the time payment is made out of assets*. In principle, the contract between [the stockholder] and the corporation was executory until the stock should be paid for in cash. It is immaterial that the corporation was solvent and had sufficient surplus to make payment when the agreement was entered into. It is necessary to a recovery that the corporation should be solvent and have sufficient surplus to prevent injury to creditors *when the payment is actually made*." (75 F.2d at 757–758, emphasis added). See also In re Bell Tone Records, 86 F.Supp. 806 (D.N.J.1949).

■ Under the *Robinson* rationale, it does not matter whether a creditor became such before or after the date of the exchange agreement; the crucial time as to creditors who will be prejudiced is the time when payment would be made, since that is the time when funds would actually be depleted. Thus, if a corporation had sufficient earned surplus to buy the stock and paid the stockholder cash for the stock at the time the agreement was made, the transaction would be valid against all creditors. However, when actual payment for the stock is to be made at some future time, the creditors who become such subsequent to the agreement may complain if payment is to be made while the corporation has no earned surplus, is insolvent, or if such payment would render the corporation insolvent. The "time for payment" is when assets are actually paid out of the corporation. Thus, in *Robinson* the giving of a note and renewal notes was not payment. Similarly, the mere exchanging of stock for debentures would not constitute payment at the time the agreement was made

since debentures are actually evidence of a corporate debt.

In our case, the corporation was bankrupt and payment to the debenture holders would be through the bankruptcy court, and therefore the corporation was insolvent at the time payment was to be made.

Based on the foregoing analysis, any creditor of the corporation existing at the time payment was to be made could be heard to complain about the exchange transaction. Such creditors did exist and complained in this case, and therefore the claims of the debenture holders should be subordinated to the claims of the other general creditors.

The judgment in Case No. 22,188–A is reversed and the case remanded to the district court.