**Harvey D. WILLIAMS, Appellant,**

**v.**

**Nathan NEVELOW, Trustee, Appellee.**

**No. 15191**

Court of Civil Appeals of Texas, San Antonio.

July 18, 1973.

Rehearing Denied Sept. 12, 1973.

Samuel D. Dibrell, Dibrell, Dotson & Dibrell, San Antonio, for appellant.

Kampmann, Church, Burns & Brenan, San Antonio, for appellee.

KLINGEMAN, Justice.

Harvey D. Williams appeals from a judgment setting aside a foreclosure of a security agreement between Highway Drilling Company, Inc., debtor, and Harvey D. Williams, the secured person, providing for the recovery of title and possession of equipment and other personal property covered under such security agreement, and ordering an accounting by Harvey D. Williams of the proceeds of all the equipment and personal property disposed by him since said foreclosure. Trial was to the court without a jury. Findings of fact and conclusions of law were made by the trial court.[1]

Appellant, Harvey D. Williams, was the owner of all of the stock of Highway Drilling Company, Inc., a Texas corporation, owning 3,300 shares. On December 20, 1968, Harvey D. Williams sold 2,136 shares of such stock to Dale L. Williams, Gordon L. Jackel and John T. Manness for a consideration of a promissory note in the amount of $186,000, executed by the purchasers and payable to Harvey D. Williams.[2] This note is payable in eighty-

---

1. Such findings of fact and conclusions of law may be summarized as follows:

*Findings of Fact*

(1) The note for $100,691 dated December 20, 1968, executed by Highway Drilling Company, Inc., payable to Harvey D. Williams was given by the corporation to purchase 1,164 shares of its own stock from Harvey D. Williams.

(2) A security agreement dated December 20, 1968, from Highway Drilling Company, Inc., debtor, to Harvey D. Williams, as secured party, was given on all personal property of the corporation described in said agreement to secure the payment of the purchase price of such shares of stock.

(3) On December 30, 1968, the retained earnings of Highway Drilling Company, Inc., were $140,633.17.

(4) The claims of the creditors represented by Nathan Nevelow, Trustee in Bankruptcy, were incurred by Highway Drilling Company, Inc., after December 23, 1968.

(5) Nathan Nevelow, Trustee, was not aware that the foreclosure of the security agreement dated December 20, 1968, on December 29, 1969, by Highway Drilling Company, Inc., was in payment of a note representing the purchase price of 1,164 shares of the corporation's outstanding stock until October 21, 1971.

(6) Harvey D. Williams in November, 1969, had notice that Highway Drilling Company, Inc., did not have money to continue doing business, could not pay its creditors, could not make the installment payments due on the $100,691 note, and that the filing of a voluntary petition in bankruptcy was contemplated.

(7) A voluntary petition in bankruptcy was filed on behalf of Highway Drilling Company, Inc., in February, 1970, and such bankruptcy proceedings are still pending.

(8) In December, 1969, the defendants, Dale L. Williams, Gordon L. Jackel and John T. Manness, as directors and shareholders of Highway Drilling Company, Inc., did not assent to the payment of Harvey D. Williams on the purchase price of the 1,164 shares of the corporation's own stock by the foreclosure of the security agreement.

*Conclusions of Law*

(1) The note for $100,691 was neither payment nor a distribution of assets of Highway Drilling Company, Inc., for the purchase of 1,164 shares of its stock and was only a conditional promise to pay when the corporation had funds on hand which could legally be used.

(2) The foreclosure of the security agreement in December, 1969, by Harvey D. Williams was payment at that time by Highway Drilling Company, Inc., on the purchase of its own shares of stock.

(3) At the time such payment was made in December, 1969, by the transfer of all personal assets of Highway Drilling Company, Inc., to Harvey D. Williams, the corporation was insolvent and this fact was known to Harvey D. Williams.

(4) The payment by the foreclosure sale was therefore void as to the creditors of Highway Drilling Company, Inc., and the bill of sale to Harvey D. Williams should be set aside and all assets returned to the trustee in bankruptcy for the corporation under the authority of Robinson v. Wangemann, 75 F.2d 756 (5th Circuit 1935).

(5) Nathan Nevelow was not guilty of laches in instituting this suit as trustee, and the claim was not barred by limitations.

(6) Since the three directors and shareholders, Dale L. Williams, Gordon L. Jackel and John T. Manness, at no time voted for or assented to the payment of the note by the foreclosure proceedings of Harvey D. Williams in December, 1969, they are not individually liable to the trustee in bankruptcy under Section 2.41 of the Tex.Bus.Corp.Act, V.A.T.S.

2. Although this note, the note given by the corporation hereinafter referred to, and the

four monthly installments of $2,542.44 each, and is secured by a pledge of Certificates Nos. 9, 10 and 11, each evidencing the ownership of 712 shares of capital stock of Highway Drilling Company, Inc. On the same date, Harvey D. Williams also conveyed the remaining 1,164 shares of stock of such corporation to Highway Drilling Company, Inc., and as a consideration therefor, the corporation executed and delivered to Harvey D. Williams a promissory note in the sum of $100,691 payable in eighty-four monthly installments of $335.64 each, covering interest only, with the first installment becoming due on February 15, 1969, with the first principal payment becoming due on February 15, 1976, after which monthly payments were in the amount of $2,972.81 each.[3] This note provided that it could not be prepaid as to any part until the note of $186,000 given to Harvey D. Williams had been fully paid and liquidated; and such note further provided that upon default of payments provided for in the $186,000 note as they became due, the entire note of $100,691 given by the corporation to Harvey D. Williams should be matured at the option of the holder. Such note recited that it was secured by a security interest from Highway Drilling Company, Inc., to Harvey D. Williams covering equipment, tools, machinery and other personal property owned by Highway Drilling Company, Inc., and by pledge of Certificate No. 12 evidencing the ownership of 1,164 shares of capital stock of Highway Drilling Company, Inc., and by an assignment of two life insurance policies, each in the principal sum of $50,000 on the life of Harvey D. Williams.

The purchase of the corporation of its own stock was authorized by the board of directors consisting of Dale L. Williams, Gordon L. Jackel and John T. Manness,[4]

with the minutes of the corporation providing that the payment of the note given for the purchase of such stock would be secured by a security agreement covering all of the personal property, equipment and inventory owned by Highway Drilling Company, Inc., and further provided that as a part of the purchase price, Harvey D. Williams was to acquire all accounts receiveable, including retainage and cash as of December 31, 1968, and that Harvey D. Williams would assume and agree to pay all accounts payable and notes payable owing by Highway Drilling Company, Inc., as of December 31, 1968, with the exception of the $100,691 note owed to Harvey D. Williams.

It is to be seen that after such sale Dale L. Williams, Gordon L. Jackel and John T. Manness were all the stockholders of such corporation and were also the directors.

A foreclosure sale was held on December 29, 1969, foreclosing the security agreement securing the corporation's note in the amount of $100,691 given to Harvey D. Williams, and at such sale the property therein covered was struck off and conveyed to Harvey D. Williams on a bid of $20,000.

Harvey D. Williams testified that he foreclosed because some of the equipment covered under his security agreement was getting in a rundown condition; that some of it had been disposed of without his knowledge; that the officers of such corporation confided in him that they were perturbed about their business and that they were probably going to have to fold it; that some of the creditors had called him personally; and that in October and November, 1969, Highway Drilling Company, Inc., was having financial difficulties. He further testified that he would not have given a cent more than $20,000 for

security agreement given by the corporation are all dated December 20, 1968, there is testimony that these transactions occurred on December 23, 1968.

3. It is to be noted that the first principal payment on this note did not become due until after the maturity date of the $186,000 note.

4. It appears that Harvey D. Williams resigned as a director on this same date.

such equipment, but there is testimony that such equipment was worth a great deal more than this; and a financial statement of Highway Drilling Company, Inc., as of June 30, 1969, listed such property as valued considerably in excess of this.

A voluntary petition in bankruptcy was filed by Highway Drilling Company, Inc., in February, 1970, and thereafter Nathan Nevelow was appointed trustee on March 17, 1970; and on November 1, 1971, appellee, Nathan Nevelow, Trustee, filed a suit in the District Court of Bexar County, Texas, to set aside the foreclosure sale.

By four points of error appellant asserts that the trial court erred in setting aside the foreclosure sale because: (1) creditors of a corporation who became creditors after the corporation had purchased its own stock from a stockholder with a note and security agreement on corporate assets cannot attack those instruments when a lien has been perfected and notice given prior to the time they became creditors; (2) the effect of the judgment rendered herein is to place all stockholders of a corporation who sell their stock to the corporation for a corporate note secured by a security agreement on corporate assets in the position of involuntary insurers of said corporation with respect to subsequent creditors, even though they perfect their lien on the corporate assets; (3) the judgment is not supported by the evidence and is contrary to law in that there is no evidence and no findings of fraud; and (4) stockholders who receive a note and security agreement from a corporation in payment for their stock in said corporation and who perfect a lien according to law under said security agreement are in a position of a secured and preferred creditor of said corporation, and their lien is preferred over all subsequent creditors.

Appellant's basic contentions in this regard can be summarized as follows: (1) it is undisputed that at the time the corporation purchased the stock, the corporation had sufficient unrestricted earned surplus required under the provisions of Article 2.-03, Tex.Bus.Corp.Act Ann., in connection with a purchase of a corporation of its own stock, and that the unrestricted earned surplus was greater than the corporation's note to appellant; (2) that all existing creditors were paid; (3) that all the creditors represented by appellee became creditors after the date of the sale of the corporation's stock to the corporation, after the execution of the security agreement, and after the financial statement and security agreement were executed and filed of record; and (4) there were no pleadings or evidence of any fraud.

It is appellee's contention that the total effect of the transactions involved and the two sales of stock by appellant was to tie up all of the assets of the corporation to secure both the corporation's note to appellant and the personal note given by the directors to appellant; that the corporation's assets were being used to secure purchases of stock personally by the directors of the corporation; and that the two transactions here involved played a major part in regard to the insolvency of the corporation and precipitated the ultimate insolvency and bankruptcy of the corporation.

Appellee's basic contention herein is that this case is controlled by the holding in Robinson v. Wangemann, 75 F.2d 756 (5th Circuit 1935), and those cases following Robinson.[5] Robinson involved a purchase by a corporation of some of its outstanding shares of stock from a large stockholder, Wangemann, for which the corporation gave its note to Wangemann for the purchase price. At the time of the delivery of the note, the corporation was solvent and the surplus in cash was more than the amount of the note. The corporation subsequently became bankrupt and Wangemann filed a claim in bankruptcy based upon the promissory note of the corpora-

---

5. In re Peoples Loan & Investment Co., Debtor, 316 F.Supp. 13 (D.C.1970); McConnell v. Estate of W. H. Butler, 402 F.2d 362 (9th Circuit 1968).

tion. In deciding that such claim should be subordinate to the claims of the other creditors of the corporation, the Court stated:

> "Arthur Wangemann loaned no money to the corporation. The note he accepted for his stock did not change the character of the transaction nor did the renewals have that effect. A transaction by which a corporation acquires its own stock from a stockholder for a sum of money is not really a sale. The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case. It is simply a method of distributing a proportion of the assets to the stockholder. The assets of a corporation are the common pledge of its creditors, and stockholders are not entitled to receive any part of them unless creditors are paid in full. When such a transaction is had, regardless of the good faith of the parties, it is essential to its validity that there be sufficient surplus to retire the stock, without prejudice to creditors, at the time payment is made out of assets. In principle, the contract between Wangemann and the corporation was executory until the stock should be paid for in cash. *It is immaterial that the corporation was solvent and had sufficient surplus to make payment when the agreement was entered into. It is necessary to a recovery that the corporation should be solvent and have sufficient surplus to prevent injury to credi-*
> *tors when the payment is actually made*. This was an implied condition in the original note and the renewals accepted by Arthur Wangemann." 75 F.2d at 757–758. (Emphasis ours).

The crucial question here involved is what point in time do we look to in regard to the solvency of the corporation, that is, the time the note and security agreement was given, or the time the foreclosure was held.

■ Under the *Robinson* rationale, it does not matter whether or not creditors became such before or after the date of the exchange agreement; the crucial time as to creditors who will be prejudiced is the time payment would be made, since this is the time when funds would actually be depleted. Thus, if a corporation had sufficient earned surplus to buy the stock and paid the stockholder cash for the stock at the time the agreement was made, the transaction would be valid against all creditors. However, when actual payment for the stock is to be made at some future time, the creditors who became such subsequent to the agreement may complain if payment is to be made while the corporation has no earned surplus, is insolvent, or if such payment would render such corporation insolvent. The time for payment is when assets are actually paid out of the corporation. McConnell v. Estate of W. H. Butler, 402 F.2d 362 (9th Circuit 1968).[6]

---

6. In *McConnell*, the Court stated with regard to a corporation repurchasing its own stock from its shareholders, there are two aspects to be considered. First, for the repurchase agreement to be valid, a corporation must have an earned surplus to pay for the stock at the time when the agreement is made; and second, for the repurchase agreement to be enforceable, a corporation must have an earned surplus at the time payment is to be made. See also 47 A.L.R.2d 758, 774–775, Rights of Creditors of Corporation with Respect to Its Purchase or Acquisition of Its Own Stock: "The transaction must be completed while the corporation remains solvent. The rule is general that even if the corporation was solvent when the transaction was entered into, if the transaction is still executory when the company becomes insolvent it cannot be enforced as against the rights of creditors then existing. This rule applies in two situations, (1) where the stockholder seeks to enforce a contract by the corporation to purchase his stock, and (2) where the corporation has purchased and received the stock and the stockholder later seeks to enforce an obligation given him by the company for the price." See also 19 Am.Jur.2d Corporations § 1002.

Article 2.03, Tex.Bus.Corp.Act Ann., provides that:

A. A corporation shall not purchase directly or indirectly any of its own stock unless such purchase is authorized by this article.

B. A corporation may purchase its own stock to the extent of the aggregate of any unrestricted surplus available therefor and its stated capital, when the purchase is authorized by the directors, acting in good faith to accomplish any of the following purposes:

(1) To eliminate fractional shares.

(2) To collect or compromise indebtedness owed by or to the corporation.

(3) To pay dissenting shareholders entitled to payment for their shares under the provisions of this act.

(4) To effect the purchase or redemption of its redeemable shares in accordance with the provisions of this act.

The purchase here involved would not appear to fall within any of the four authorized catagories.[7]

The Court in Sanford v. First National Bank of Marysville, Kansas, 238 F. 298 (8th Circuit 1917), set forth some of the considerations that have been considered by the courts in condemning or sustaining the purchase of its own stock by a corporation, which may be summarized as follows: (a) Was there a fraudulent purpose to injure existing creditors or other stockholders or future creditors? (b) Was the necessary result of the transaction to produce such injury? (c) Did the injury result immediately or did it result remotely and become comingled with other events, so as to leave the question in doubt as to whether the stock purchase was the real cause of the alleged injury? (d) Was the

corporation insolvent at the time or did the transaction precipitate its insolvency?

Looking at all the facts of the case before us, we have concluded that the case was properly decided by the trial court, and that the trial court was correct in concluding that the case was controlled by the rationale of *Robinson*. Appellant's first four points of error are overruled.

By his fifth point of error appellant asserts that a trustee in bankruptcy who does not file a suit to set aside a foreclosure and trustee sale until thirty-one months after such foreclosure and twenty-nine months after the corporation filed its petition in bankruptcy, is guilty of laches.

Two of the essential elements of laches are: (1) unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of delay. City of Fort Worth v. Johnson, 388 S.W.2d 400 (Tex.1964).

There is no hard and fast rule either as to the lapse of time or the circumstances which will justify the application of the doctrine of laches. In addition to mere lapse of time, there must exist some circumstances from which the defendant may be prejudiced, or there must be such a lapse of time that it may be reasonably supposed that such prejudice will occur if the remedy is allowed. Laches is a question of fact on the evidence and must be determined by a consideration of all the circumstances of each particular case. It is a question to be determined primarily and very largely by the trial court, and an appellate court will not interfere with its discretion in this respect unless manifest injustice has been done, or unless its conclusion cannot reasonably be held to find support in the evidence. Wolpert v.

7. This article also provides that in no case shall a corporation purchase its own shares when there is a reasonable ground for believing that the corporation is insolvent, or

will be rendered insolvent by such purchase, or when, after such purchase, the fair value of its total asset shall be less than the total amount of its debts.

Gripton, 213 Cal. 474, 2 P.2d 767 (1931); Brady v. Garrett, 66 S.W.2d 502 (Tex. Civ.App.—El Paso 1933, writ dism'd); 35 Tex.Jur.2d Laches and Stale Demands § 17.

The trial court found that Nathan Nevelow, Trustee, was not aware that the foreclosure of the security agreement dated December 20, 1968, on December 29, 1969, by Harvey D. Williams was in payment of a note representing the purchase price of 1,164 shares of the corporation's outstanding stock until October 21, 1971, when in a hearing in the bankruptcy court the defendant, Harvey D. Williams, produced copies of the minutes of the special meetings of the shareholders and board of directors of Highway Drilling Company, Inc., held December 23, 1968, a copy of the $100,691 note dated December 20, 1968, and a copy of the security agreement of the same date covering all personal assets of the corporation. The trial court also found that Nathan Nevelow, Trustee, was not guilty of laches in instituting this suit. Mr. Nevelow testified in some detail as to his efforts to obtain the information from Harvey D. Williams, Dale L. Williams, and other sources with regard to the transactions here involved, and of his inability to do so; and he testified that he did not gain knowledge of the December, 1969, transaction until the hearing on October 21, 1971, in bankruptcy court. The court's findings are sufficiently supported by the record.

Appellant's fifth point of error is without merit and is overruled.

Appellant's sixth point of error is directed to the error of the trial court in failing to comply with appellant's request for additional findings of fact. At the request of appellant, the trial court made findings of fact and conclusions of law. Appellant then excepted and objected to such findings theretofore made by the court and also requested the court to make fourteen additional findings. The transcript is devoid of any additional findings of fact; and, therefore, it may be presumed that the court failed to comply with the request of appellant to make additional findings. However, the record also fails to reveal that appellant filed any bill of exception to the trial court's failure to make additional requested findings of fact. The failure or refusal of the court to make additional findings of fact will not be reviewed when it is not made the subject of a bill of exception, and any error in regard thereto was waived. Stolte v. Mack Financial Corp., 457 S.W.2d 172 (Tex.Civ. App.—Texarkana 1970, no writ); Dillingham v. Dillingham, 434 S.W.2d 459, 462 (Tex.Civ.App.—Fort Worth 1968, writ dism'd); Spradlin v. Rosebud Feed & Grain Co., 294 S.W.2d 301 (Tex.Civ.App. —Waco 1956, writ ref'd n. r. e.). Moreover, the record contains a full and complete statement of facts, which we have reviewed, and we do not see how any prejudice could be said to have accrued to appellant, and appellant was not deprived of any right to preserve and present any error of which he wished to complain. Swanson v. Swanson, 148 Tex. 600, 228 S. W.2d 156 (1950); Dillingham v. Dillingham, supra; Forbes v. Forbes, 430 S.W.2d 947 (Tex.Civ.App.—Amarillo 1968, no writ). Appellant's sixth point of error is overruled.

The judgment of the trial court is affirmed.