Robert O. LIPPI, Trustee for Pacific Industrial Distributors, Inc., Plaintiff–Appellant,

v.

CITY BANK; Edward F. Plant; United States National Bank of Oregon, Personal Representative of the Estate of Robert E. Hamilton, Deceased, Defendants–Appellees.

Robert O. LIPPI, Trustee for Pacific Industrial Distributors, Inc., Plaintiff–Appellant,

v.

CITY BANK, Defendant,

and

Linda R. Russell, as Personal Representative of the Estate of Shirley M. Russell, Deceased; Edward F. Plant, Defendants–Appellees.

Nos. 89–15891, 90–15907.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 1991.

Decided Jan. 23, 1992.

H. William Burgess, Honolulu, Hawaii, for plaintiff-appellant.

James A. Agena, George W. Playdon, Jr., Reinwald, O'Connor & Marrack, James Duca, Honolulu, Hawaii, for defendants-appellees.

Before FLETCHER, NORRIS and TROTT, Circuit Judges.

FLETCHER, Circuit Judge:

Robert O. Lippi, the trustee in bankruptcy for the debtor, Pacific Industrial Distributors, Inc. ("PID"), appeals grants of summary judgment to the two selling stockholders and one of the financing banks of a failed leveraged buy-out of PID. The trustee seeks to recover money he alleges was obtained through fraudulent and/or

illegal transfers. He also appeals post-judgment orders declining to hold the transfers null and void as to the stockholders and bank.

## BACKGROUND

PID is a Hawaii corporation which did business in the State of Hawaii from 1973 through sometime in 1986 as a wholesaler of construction materials. In April, 1981, the outstanding capital stock of PID consisted of 375 shares owned by Edward F. Plant, Robert E. Hamilton and Earl C. Russell, who were also the three directors of the corporation. Russell was both the President and Secretary and was primarily responsible for running PID since both Hamilton and Plant resided on the mainland. However, there was evidence in the record that Hamilton and Plant maintained close contact with Russell. In addition, they regularly drew "consulting fees" from PID which amounted to close to $100,000 between them annually in 1979 and 1980.

PID had operated profitably for several years. Its audited financial statement for the fiscal year ending September 30, 1980 showed a total stockholders' equity of $195,450. Early in 1981 PID began an expansion into new operations in Alaska and other west coast locales. The directors asked the accounting firm of Peat Marwick Mitchell & Co. (Peat Marwick) to undertake a review of the proposed expansion. The resulting report listed as a disadvantage that the proposed expansion would require "the assumption of significant additional financial risks." The report also noted at several points that PID was undercapitalized and recommended that "[m]easures should be taken immediately to increase working capital." By August, 1981, however, PID had advanced approximately $64,000 to PID–Alaska.

During roughly the same period, Russell decided to buy out the stock of Plant and Hamilton, and offered them $500,000 for their 250 shares. Russell and City Bank (one of the lending banks) assert that the motivation for the buy-out was Russell's belief that as sole shareholder he could make PID more profitable than it was with

three shareholders, in part by eliminating Plant and Hamilton from the corporate payroll and consolidating their functions in a single new Hawaii employee, Jack Simpson, who was a certified public accountant. It is that buy-out, structured as a leveraged buy-out (with the assets of PID pledged as security for some of the money borrowed to purchase the shares), which underlies the claims presently before us on appeal.

Documents drafted by attorney E. Gunner Schull indicate that he structured the original transaction to have PID and Russell purchase the stock of Plant and Hamilton. At the time that he sent the initial proposed agreement to the parties, Schull wrote a letter informing them that by law the shares could be purchased by PID "only out of earned or paid-in surplus and thus, to the extent that the purchase price exceeds the corporate surplus, the balance of the shares should be purchased by [Russell] personally." The initial proposed agreement contained a clause providing that PID and Russell

> hereby represent and warrant that the consideration for the shares purchased by the Corporation shall be made from earned or paid-in surplus of the Corporation, and the Corporation shall provide evidence of the existence of such surplus satisfactory to the selling shareholders at the closing date.

That version of the agreement was never executed, however, although Plant and Hamilton both signed stock powers in mid-May transferring their shares to PID.

Ultimately the transaction was structured so that Russell and a shell corporation formed by him, ECR Ltd., at least on paper, purchased the 250 shares. ECR was incorporated with $1,000 of capital, and was owned 87% by Earl C. Russell and 13% by his father, Earl R. Russell. ECR never had any employees and the only significant activity through its bank account during the relevant period consisted of receipt of money from PID "dividends" and various loans, and payments out to Plant and various lenders. Only $12,500 of the $500,000

purchase price was provided by Russell himself. ECR and Russell borrowed $37,-500 from an individual named Joseph Cochran; they borrowed an additional $100,000 from Carlinville National Bank structured as a loan to Russell's parents, Earl R. and Shirley Russell. Plant agreed to defer receipt of $100,000 of the $250,000 purchase price owed him.[1] The $100,000 deferred payment was secured by a pledge of the shares of stock purchased from Plant; it was not guaranteed by PID directly or secured by PID assets. The promissory note was executed by ECR Ltd. and Earl C. Russell.[2]

The remaining $250,000 was obtained from a Small Business Administration (SBA) loan through City Bank to PID.[3] PID signed a promissory note for $250,000, and gave City Bank a security interest in all of PID's assets. The $250,000 of loan proceeds was in turn "lent" to Russell and ECR for purchase of Hamilton's stock.[4] In fact, the SBA loan portion of the transaction ended up being somewhat more complicated. Because the SBA processing was not complete at the time of closing on June 23, 1981, City Bank lent $250,000 to Russell and his wife, Linda, personally, secured by a fourth mortgage on their home, with a provision that "[r]epayment [was] to come from funding of a 90% SBA Guaranty loan in the amount of $250,000." Thus, at the closing of the transaction, the source of the $250,000 payment to Hamilton was a personal loan to the Russells. However, when the SBA loan came through on August 24, 1981, it was immediately applied on the Bank's books to pay off the interim advance to the Russells, leaving only PID liable on the loan.

The trustee asserts that PID's liability for the $250,000 loan had the immediate effect of shifting PID's net worth from positive to negative.[5] He also contends that PID's negative net worth was shielded from potential creditors' view by structuring the transaction so that PID did not buy treasury stock. Potential creditors were thus unaware of the significant outflow of payments from PID to meet the various loan obligations. Defendants assert, to the contrary, that nothing about the transac-

1. Plant and Hamilton then arranged between themselves for Hamilton to pay Plant $50,000 and receive half of the later payments to Plant on the remaining $100,000. Thus, each received $200,000 at the time of purchase and an additional $50,000 plus interest through later payments.

2. When the payment schedule on this promissory note was adjusted in 1982, the signatories were once again ECR and Russell, and not PID.

3. Russell and Simpson had also approached the Bank of Hawaii for an SBA loan and assert that they ultimately chose City Bank because of a better interest rate and a larger loan amount. The Bank of Hawaii loan officer advised Simpson that "the only way an SBA loan could assist in this matter would be for the loan to be made to PID and for the corporation to purchase treasury stock which would devastate net worth." The Bank of Hawaii went on to state that "the correct way for Earl Russell to buy out the other two would be for Earl to raise some cash personally on his real estate holdings, make a down payment to Plant and Hamilton and have them take the note from Earl personally for the balance of the sales price and for Earl to give the other two a lien on the stock of PID. This approach would not tie up the credit of PID and would not reduce net worth of the company by increasing treasury stock."

City Bank's own explicit conditions on the SBA loan to PID reflected these same concerns with preserving at least the appearance of net worth:
  1. To preserve PID's net worth, none of Mr. Plant's or Mr. Hamilton's stock will be purchased through a Treasury stock acquisition.
  2. City Bank will provide $250,000 of the purchase price through a loan to PID which, in turn, will loan the funds to Earl Russell. Mr. Russell would then use the funds to purchase, in his name, one half of the stocks being sold by Messrs. Plant and Hamilton.
  3. City Bank must approve of the method in which the remaining stocks will be purchased.

4. Although an account receivable from ECR, Ltd. in the amount of $250,000 was placed on the books of PID, there were never any payments made on that receivable.

5. The district court's order granting summary judgment noted that the question of whether PID was rendered insolvent by the LBO was "vigorously disputed" by the parties. Thus, for purposes of summary judgment, since we consider disputed facts in favor of the nonmoving party, we assume that the stock purchase rendered PID insolvent.

tion was concealed, that financial statements fully disclosed the various parts of the transactions, and that City Bank properly recorded its security interest in PID's assets.

Ultimately PID paid out $667,000 either directly to City Bank in repayment of the $250,000 loan or in dividends to ECR which ECR used to make payments to Russell, Cochran, Plant and Carlinville National Bank. All of the lenders who financed the LBO were eventually paid in full.[6] In pretrial depositions Russell, Simpson and Michael Kawamoto, the City Bank loan officer, all stated that it was their understanding at the time of the transaction that money for repayment of the various obligations was all to come from profits from operations of PID. All three of them were aware that PID was directly liable for the $250,000 loan and that its assets were pledged as security for that loan.

Plant also indicated in his deposition that:

> [i]t was [his] expectation that, after the June 1981 closing, PID would continue to generate substantial income and profits for its new shareholder ECR, that would enable that shareholder to meet its obligations to [him] and to any other entity from whom funds were borrowed in order to finance the acquisition of the PID shares owned by [him] and Mr. Hamilton.

Despite this expectation that repayment would come—indirectly at least—from profits generated by PID, Plant stated in deposition and affidavits that he was unaware of how ECR obtained the financing to purchase his and Hamilton's shares, that he had nothing to do with the structure of the transaction, that he had no knowledge that PID assets were being encumbered, and that he believed that Russell personally held sufficient assets to obtain financing for the transaction. There was no direct evidence presented to the court on summary judgment that Plant or Hamilton had knowledge of how the transaction was structured or that PID was liable to repay some of the obligations related to the buyout. They received all of their payments by way of City Bank cashier's checks or checks drawn on ECR. Although they remained directors and officers of PID as a technical, legal matter until December of 1981 and January of 1982, Russell and Plant both testified in deposition that it was the clear understanding of all parties that Plant's and Hamilton's roles as officers, directors and consultants would terminate at the time of the stock buy-out. There was no evidence in the record to indicate that Plant or Hamilton took any role in managing the affairs of PID after that point.

In November, 1984, three unsecured creditors filed an involuntary Chapter 7 bankruptcy petition for PID. On April 16, 1985, PID converted the bankruptcy proceeding to a Chapter 11 proceeding. A bankruptcy schedule filed around that time showed $485,000 in debts outstanding to unsecured creditors. On April 15, 1987, the trustee filed in bankruptcy court the adversary complaint underlying the present appeal, seeking to recover fraudulent transfers, preferential transfers, post-petition transfers and damages.[7]

The bankruptcy court denied a first round of motions for summary judgment by the defendants on March 22, 1988, finding that

> there [were] triable issues including: whether the purchase of the stock was by PID, ECR, Ltd., or Earl C. Russell; were Plant and Hamilton aware, or should they have been aware, that the money to purchase the stock would come from Debtor; was this a sham purchase by ECR, Ltd.; was an empty corporate

---

6. The final payment on the Carlinville National Bank loan was made on September 28, 1983. The last ECR payment to Plant was on May 3, 1984. Joseph Cochran was paid in full by April 2, 1982. Russell himself was repaid his $12,500 at some point. Finally, PID made its final payment on the City Bank loan on September 24, 1988.

7. The complaint also challenged a number of other transfers and transactions which are no longer at issue in this appeal. For purposes of this appeal, the only remaining defendants-appellees are Plant, Hamilton and City Bank and the only relevant transfers are those arising from the LBO.

shell used to purchase the stock; did the corporation have surplus when the payments were made for the stock purchase; did Plant and Hamilton ever resign as officers and directors.

After the reference was withdrawn, the case returned to the district court, and discovery essentially completed, the various defendants filed a second round of summary judgment motions. All of the defendants argued that the trustee lacked standing to bring claims related to transfers prior to June 9, 1983, the date on which the earliest creditor came into existence. Plant and Hamilton argued that there was no evidence that they had fraudulent intent or that they had any power to prevent the payment of illegal dividends following the buy-out when their roles as directors and officers effectively were terminated, and that they were protected by the safe harbor rule of 11 U.S.C. § 550 because they received their transfers in good faith and for value. City Bank likewise argued that there was no evidence of fraudulent intent on its part and that it acted in good faith and gave fair value in exchange for the loan payments which it received. The district court granted the motions for summary judgment on April 13, 1989, finding no evidence of fraudulent intent on the part of the stockholders or the bank and no evidence that either had acted other than in good faith or had not given value for the moneys received from PID, ECR and Russell. It likewise held that the trustee lacked standing to challenge any pre-June 9, 1983 transfers absent fraudulent intent on the part of the particular defendant. The trustee filed a timely notice of appeal.

The case proceeded to trial against only the Russell defendants. The jury, in a special verdict, found, *inter alia*, that PID indirectly had purchased the stock of Plant and Hamilton and that PID's payments to City Bank and ECR had created a capital deficit; that Earl C. Russell did *not* intend to hinder, delay or defraud PID's subsequent creditors when he structured the LBO as he did and when he made pre-June 9, 1983 payments to City Bank and ECR; that Russell *did* intend to hinder, delay or defraud PID's existing creditors by the transfers made and obligations incurred after June 9, 1983, including the monthly payments to ECR and City Bank to pay off the buy-out loans; and that Russell breached his fiduciary duty to PID and its creditors.

Following the jury's verdict the trustee sought to have judgment entered that all of the LBO-related transfers were null and void, including those to City Bank and the selling shareholders. The district court declined to enter the judgment in the form sought by the trustee. It likewise denied the trustee's motion to amend or alter judgment, indicating its view that the issues of recovery against the remaining defendants had been decided conclusively at summary judgment. The trustee appeals both the summary judgment order and the court's subsequent refusal to declare the transfers null and void as to all parties.

## DISCUSSION

■ A grant of summary judgment is reviewed de novo, *Isom v. United States Internal Revenue Service (In re Isom)*, 901 F.2d 744, 745 (9th Cir.1990). We consider whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Williams v. United States Gen. Servs. Admin.*, 905 F.2d 308, 310 (9th Cir.1990). Our review is limited to the record presented to the district court at the time of summary judgment. *Harkins Amusement Enterprises, Inc. v. General Cinema Corp.*, 850 F.2d 477, 482 (9th Cir.1988), *cert. denied*, 488 U.S. 1019 (1989); 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2716 (2d ed. 1983). Thus, since the district court properly declined to consider supplemental materials filed by the trustee after the hearing on the summary judgment motion, we do not consider those materials in reaching our decision. We likewise do not rely on evidence introduced at trial or on the jury's verdict.

Whether the district court properly refused to enter judgment declaring the various transfers null and void as to all parties involves questions of law which are likewise viewed de novo. *United States v. Karsseboom*, 881 F.2d 604, 606 (9th Cir. 1989).

### A. *Form of Judgment*

█ Following the jury's verdict, the trustee submitted to the court a proposed form of judgment which specified, *inter alia*, that the obligations incurred by PID and transfers related to the LBO were null and void. The district court refused to enter judgment in that form. On appeal the trustee argues that avoiding a transfer pursuant to 11 U.S.C. § 544(b) is separate and distinct from recovering the amounts transferred from the transferees or persons benefitted pursuant to 11 U.S.C. § 550, and that the jury's verdict renders all of the LBO-related transfers null and void pursuant to section 544(b). While the first part is true, i.e., that avoidance and recovery from transferees are distinct concepts under bankruptcy law, the conclusion that all of the transfers are void does not follow.

Section 544(b) provides that "[t]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim ..."; section 550 specifies the conditions under which, once a transfer is avoided under section 544 or other provisions, a trustee can recover from various transferees. The legislative history explains that "Section 550 prescribes the liability of a transferee of an avoided transfer and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee." H.R. No. 95–595, 95th Cong. 1st Session 375–76 (1977); Senate Report No. 95–989, 95th Cong. 2nd Session 90 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5876, 6331, 6332. There are, in effect, three conceptual steps

to the trustee's case; the trustee must establish: 1) fraud or illegality under the applicable substantive law; 2) resulting voidness or voidability of the transfer under the applicable law so as to allow avoidance pursuant to 544(b); and 3) liability of the particular transferee pursuant to the provisions of section 550.

As the trustee himself points out, he followed customary practice and filed a consolidated action both to set aside the transfers and to recover them or their value from the various transferees. When the case went to trial as to the Russells, the jury decided that some of the transfers were illegal or fraudulent under the substantive state law, and also decided facts relevant to the section 550 determination. Implicit in the court's judgment against the Russells was a decision on the intermediate legal question of voidability or avoidance.[8] Thus, the final judgment reflected the fact that the trustee prevailed as to all three conceptual steps as against the Russells. The trustee sought a "Judgment Voiding Transfers Pursuant to Special Verdict" (in essence a statement that the trustee had prevailed on steps one and two as against the world at large), coupled with a separate "Money Judgment" specifying the amount of recovery against the Russells.

The district court properly rejected the trustee's proposed form of judgment for two reasons. First, the proposed judgment failed to acknowledge that the summary judgment order already had decided the question of section 550 recovery in favor of all of the remaining defendants. Although the summary judgment order did not clearly separate its discussions of the underlying fraud or illegality, avoidability and recovery, it is apparent both from the order itself and from the briefing of the motions that all three questions were before the court on summary judgment, and that the district court decided the section 550 question in favor of the banks and shareholders. Likewise, in the Final Pretrial Order, the magistrate indicated that "[s]ummary judgment ha[d] been entered *as to all issues*

---

**8.** Indeed, the trial court explained to the jury which portion of its instructions addressed "avoiding or setting aside transfers" and which

portion addressed "the trustee's right to recover from the transferees."

*between plaintiff and all defendants except the Russell defendants."* (emphasis added). Thus, rightly or wrongly, the summary judgment order decided the question of whether the trustee could recover from the banks and shareholders pursuant to section 550, and it would have been inappropriate for the trial court to have entered a judgment suggesting that the question had remained open.

A second problem with the form of judgment proposed by the trustee is that it would bind the banks and shareholders to the jury's verdict regarding fraud and illegality when they were dismissed from the case on summary judgment and did not participate in the trial of those questions. While the trustee may argue that the jury's findings should be binding on the banks and shareholders based on principles of collateral estoppel, that is not a foregone conclusion and should be considered by the district court in the first instance.

### B. *Standing*

The district court, in its summary judgment order, relied on *Kupetz v. Wolf & Vine*, 845 F.2d 842, 849 n. 16 (9th Cir.1988) and *Credit Managers Ass'n v. Federal Co.*, 629 F.Supp. 175 (C.D.Cal.1985), for the proposition that "the trustee has standing to sue on behalf of those creditors whose claims arose subsequent to the challenged transactions, only if the trustee has produced evidence of actual fraud sufficient to withstand each defendant's motion for summary judgment." The district court then undertook a defendant-by-defendant assessment, concluding that there was a question of fact as to the Russells' "liability under the applicable counts," including a question of fact as to their intent to defraud existing or future creditors, but that the remaining defendants were entitled to summary judgment on the question of their intent to defraud. As a corollary, the dis-

trict court held that the trustee therefore lacked standing to sue those defendants.

It bears noting as an initial matter that the standing discussion in *Kupetz* centers on a provision of California law, Cal.Civ. Code § 3439.05,[9] which does not have a clear counterpart in Hawaiian law. In *Kupetz* we were concerned with a statute which provided subsequent creditors with a remedy absent any proof of actual fraud on the part of the defendant. We found it inappropriate to allow subsequent creditors standing to sue under that statute under circumstances where the leveraged buy-out had been widely publicized:

> Because fraudulent conveyance statutes were designed to protect creditors from *secret* transactions by debtors, the same rules should not apply when the transaction is made public. Future creditors may not complain when they knew or could easily have found out about the transaction. This certainly appears to be the case in this particular LBO. The transaction was well-publicized and the Trustee has not claimed or presented evidence that any of the future creditors were not aware of Wolf & Vine's financial dealings. In the context of this well-publicized LBO, this court will not permit later-arising creditors to attack an LBO purchase transaction as a fraudulent conveyance under section five of the UFCA.

*Kupetz*, 845 F.2d at 849 n. 16. In that context we held that the grant of standing to future creditors provided by section five "must be modified in light of an LBO in which there was no actual intent to defraud." *Kupetz*, 845 F.2d at 849 n. 16.

We have no quarrel with the district court's legal conclusion, drawn from *Kupetz* and *Credit Managers*, that in the context of LBOs, future creditors' right to sue must be limited to cases where there is actual intent to defraud or to conceal the transaction from public scrutiny. Indeed,

---

**9.** Unlike California's other fraudulent conveyance sections which specify "that a transfer cannot be set aside as a fraudulent conveyance unless the creditor had a claim in existence at the time of the purported fraudulent conveyance," *Kupetz*, 845 F.2d at 849, n. 16, section 3439.05 provides that "a conveyance made with-

out fair consideration that leaves the transferor with unreasonably small capital is fraudulent, despite lack of fraudulent intent, 'as to creditors *and as to other persons who become creditors during the continuance of such business or transaction.'* " *Id.*

that approach is consistent with Hawaii's common law of fraudulent conveyance, which allows subsequent creditors to set aside a conveyance only where it is shown that the debtor conveyed with intent to defraud creditors, that the transfer was secret or concealed, or that the debtor transferred with the intention of engaging in a new and hazardous business, the risk of which would be placed upon subsequent creditors. *See Metzger v. Lalakea,* 32 Haw. 706 (1933).

The district court erred, however, in applying the standing test on a defendant-by-defendant basis rather than on the basis of the nature of the transaction.[10] *Kupetz's* reasoning makes clear that the focus of the "actual intent to defraud inquiry" for standing purposes should be the transaction, not the role of each defendant in relation to the fraud. The *Kupetz* opinion discusses *"secret transactions* by debtors" and indicates that "the same rules should not apply when the *transaction* is made public." 845 F.2d at 849–50 n. 16 (emphasis added). It goes on to state that "[f]uture creditors may not complain when they knew or could easily have found out about the *transaction....*" *Id.* The *Kupetz* court likewise observed that

> all existing creditors had the opportunity to gain the knowledge of Wolf & Vine's financial status and its heavy debt structure prior to extending credit to it. Creditors easily could have asked for financial information before extending credit.

Moreover, the transaction was well-publicized within the industry. To ask Wolf to underwrite the creditors' losses, due partially at least to their failure to inquire adequately, would not be just.

*Id.* at 849–50. Thus, the issue is whether future creditors were somehow precluded by actual fraud or concealment from discovering the nature of the *transaction* and the company's financial status at the time of their advances. Whether every defendant or transferee is in on the fraud or concealment is irrelevant.[11] In this case, the district court held that there were remaining questions of fact as to whether Earl C. Russell intended to defraud subsequent creditors by virtue of the LBO and deliberately structured it to conceal PID's financial condition.[12] It therefore was error for the district court to find on summary judgment that the trustee lacked standing to challenge the pre-June 9, 1983 transfers.

Ultimately, of course, the jury found that Russell did not have intent to defraud subsequent creditors at the time the LBO was structured, and that he made no effort to conceal the nature of the transaction at that time. However, that information is not properly before us in our review of the district court's summary judgment order. *Harkins Amusement Enterprises,* 850 F.2d at 482. As the defendants themselves assert, we are limited to the record which was before the district court at the time of

---

**10.** In *Kupetz* that distinction was irrelevant because there was only one category of defendant, the selling shareholders, against whom there were no remaining allegations of intentional fraud. 845 F.2d at 848. Accordingly, we found that the trustee lacked standing to attack transactions which took place prior to the existence of the remaining creditors. Here, however, the cast of characters included various defendants who possessed different knowledge and who stood in different relations to the debtor, as evidenced by the fact that the court granted summary judgment to some defendants but not to others on the fraud claims.

**11.** The transferees' knowledge or intent, and the equity of allowing recovery from various transferees, is a separate question governed by the applicable substantive law and section 550.

**12.** Questions 13–15 on the Special Jury Verdict Form confirm that questions of actual fraud

and concealment as to the LBO remained following summary judgment. In those questions, the court asked the jury to consider, in relation to all of the pre-June 9, 1983 transfers, whether the Russells "intend[ed] to hinder, delay or defraud PID's subsequent creditors"; whether "there [was] secrecy in some or all of the transactions ... by which knowledge of them was withheld from creditors who dealt with PID believing it was financially strong"; and whether "the transfers ... [were] made or done at about the time of or with the view of having PID enter into an economically hazardous expansion risk of which Earl C. Russell intended should be case upon the parties having future dealings with PID." These essentially are the three bases that *Metzger v. Lalakea* sets out as the basis for subsequent creditor recovery. *Metzger v. Lalakea,* 32 Haw. 706, 719–20 (1933).

summary judgment. *Id.* The bank and shareholder defendants may well have an argument that the jury verdict rejecting the trustee's claims of fraud and concealment at the outset of the LBO collaterally estops the trustee from avoiding pre-June 9, 1983 transfers on behalf of subsequent creditors. However, that question is not before us at this juncture.

■ Finally, regardless of actual intent to defraud, the trustee had standing to challenge any of the *payments* made subsequent to June 3, 1983 in violation of H.R.S. § 416–28, which arguably include a substantial number of payments from PID to City Bank and some payments from PID to ECR and then to Plant. *See Kupetz,* 845 F.2d at 850 (trustee had standing to attack payments to selling shareholders made after creditors were in existence if "at the time the payments were made, the corporation did not have enough retained earnings"); *McConnell v. Estate of Butler,* 402 F.2d 362, 366 (9th Cir.1968) (corporation must have an earned surplus *at the time payment is to be made* ).

### C. *Avoidability of Transfers Violating H.R.S. § 416–28*

■ Section 544(b) permits the trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim...." City Bank asserts that the transfers by PID to City Bank are not voidable because H.R.S. § 416–28 does not address remedies for its violation or provide expressly that transfers made in violation of the section are void or voida-

ble.[13] H.R.S. § 416–28 provides in relevant part that

> A corporation may purchase shares of stock issued by it ... provided that no purchase shall be made when the value of the assets of the corporation is less than the amount of its debts or when the effect of the purchase would be to reduce the value of the assets of the corporation to less than the amount of its debts.[14]

Haw.Rev.Stat. § 416–28 (repealed 1987). The section itself provides no remedies for its violation. It simply states that "[a] corporation *shall not* purchase, directly or indirectly, any shares of stock issued by it, except as permitted by this section." (emphasis added) Nor does the chapter in which section 416–28 is located specify remedies.

City Bank suggests that because there is no mention of remedies in section 416–28, there may be no remedy for its violation. We find that argument untenable as a theoretical matter since it would render the section nugatory. Moreover, Hawaii has an umbrella provision governing prohibitory laws such as 416–28. H.R.S. § 1–6 provides: "Whatever is done in contravention of a prohibitory law is void, although the nullity be not formally directed." Haw.Rev.Stat. § 1–6 (1985). Hawaiian courts have defined "a prohibitory law" as "one which forbids all actions which disturb the public repose, or injury to private rights, ... or certain actions in relation to the transmission of estates, the capacity of persons or their objects." *Parke v. Parke,* 25 Haw. 397, 403 (1920).

Cases from other jurisdictions involving provisions parallel to 416–28 also support the conclusion that indirect purchases of

---

**13.** City Bank also contends that because H.R.S. 416–28 does not create an independent duty upon City Bank as a lender, City Bank cannot be liable for violation of the section unless it was a controlling person of the corporation or a co-conspirator. The trustee, however, does not seek to hold City Bank independently liable for violation of the statute and does not argue on appeal that City Bank was a "controlling person." He simply seeks avoidance as a remedy for the corporation's and its directors' violation of the statute. Whether City Bank was a controlling person is therefore irrelevant.

**14.** The question of whether the LBO amounted to an indirect purchase by PID of its own stock in violation of H.R.S. 416–28 went to the jury, which found that it was such an indirect purchase. Of course we may not consider the subsequent jury verdict in evaluating the district court's decision on summary judgment. The collateral estoppel effect, if any, of the jury's verdict must be considered in the first instance by the district court on remand.

stock by a corporation in violation of section 416–28 are voidable within the meaning of 11 U.S.C. § 544(b). In *McConnell v. Estate of Butler,* we considered former Cal.Corp.Code § 1706 (requiring corporations' purchase of their own shares to be made out of earned surplus), and held that

> [w]ith regard to a corporation repurchasing its own stock from its shareholders, there are two aspects to be considered. First, for the repurchasing agreement to be *valid* the corporation must have an earned surplus to pay for the stock *at the time when the agreement is made....*
>
> Second, for the repurchasing agreement to be *enforceable,* the corporation must have an earned surplus *at the time payment is to be made.*

*McConnell,* 402 F.2d at 366. *McConnell* is distinguishable from the present case in that the agreement to purchase the shares was executory (the company had exchanged debentures of the company for shares of stock owned by its employees, thus entitling the debenture-holders to fixed annual payments over a period of time). The creditors were not seeking to recover payments already made to the debenture-holders; rather, they were seeking to exclude the debenture-holders from sharing in the proceeds of the bankruptcy ratably with general creditors. In that context, the court held that "the claims of the debenture holders should be subordinated to the claims of the other general creditors." *Id.,* 402 F.2d at 367. *McConnell* therefore does not address squarely the question of avoiding payments already made by a corporation in violation of provisions such as section 416–28. It does suggest, however, that the good faith of the selling shareholders is irrelevant to the voidability of the sale:

> A transaction by which a corporation acquires its own stock from a stockholder for a sum of money is not really a sale. The corporation does not acquire anything of value equivalent to the depletion of its assets ... It is simply a method of distributing a proportion of the assets to the stockholder. The assets of a corporation are the common pledge of its cred-

itors, and stockholders are not entitled to receive any part of them unless creditors are paid in full. When such a transaction is had, *regardless of the good faith of the parties,* it is essential to its validity that there be sufficient surplus to retire the stock without prejudice to creditors.

*Id.,* 402 F.2d at 366 (emphasis added) (quoting *Robinson v. Wangemann,* 75 F.2d 756 (5th Cir.1935)).

A more recent Sixth Circuit case, applying a parallel Delaware provision, Title 8, § 160, Delaware Statutes, *amended* 59 Del. Laws, c. 106, § 3, addressed the argument that the section should not be construed to permit a remedy for creditors against innocent shareholders who sell stock to the corporation in good faith and without knowledge that the capital of the corporation is being impaired. *In re Kettle Fried Chicken of America, Inc.,* 513 F.2d 807 (6th Cir.1975). In *Kettle Fried Chicken,* unlike in *McConnell,* the purchases were already complete. In that context, the Sixth Circuit held that "[w]here the corporate act is illegal, the shareholder's lack of knowledge of the illegality cannot be controlling and *the transaction is voidable by the trustee for the creditors.*" *Id.* at 813 (emphasis added).

The present case is further complicated because of the structure of the stock purchase. Both *McConnell* and *Kettle Fried Chicken* indicate that recovery may be had from the selling shareholders. We must consider, however, whether only the ultimate transfer to the stockholder is voidable, or whether all of the transaction's component parts are likewise voidable, thus allowing recovery of the loan repayments (including interest) made to the bank. Section 416–28 prohibits both "direct and indirect" purchases by a corporation of its stock. Related transactions facilitating an illegal indirect purchase therefore would appear to be within the contemplation of the statute and its prohibitions, and likewise within the reach of H.R.S. § 1–6's mandate that "[w]hatever is done in contravention of a prohibitory law is void."

We are not here confronted with the situation of a bank which lent money to a corporation without knowledge of its intended purpose or the potential for violation of 416–28. Rather, City Bank not only was aware that PID would lend the funds to Russell to purchase half of the stock, but appeared to play a role in structuring the transaction. Indeed, City Bank imposed conditions that the stock not be purchased through a treasury stock acquisition, and that City Bank approve the method in which the remaining stocks would be purchased. *Cf. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1303 n. 8 (3rd Cir.1986) (holding the LBO lender liable on fraud claims and distinguishing a situation "where the lender is unaware of the use to which the loans (sic) proceeds are to be put"), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). In *Tabor*, as in the present case, the bank "was intimately involved with the formulation of the agreement whereby the proceeds of its loan were funneled into the hands of the purchasers of the stock of a corporation that [arguably] was near insolvency."

Assuming that the factfinder determines the various transfers to be "one integral transaction" amounting to an indirect purchase by PID of its stock in violation of H.R.S. § 416–28, we conclude that where, as here, the lender has knowledge of the planned purchase, the component transfers are also avoidable pursuant to H.R.S. § 416–28 and 11 U.S.C. § 544.[15]

### D. *Recovery from City Bank as Transferee*

■ The district court granted summary judgment for City Bank as to all counts, finding that "City Bank financed the LBO in good faith, and gave fair value in exchange for the transfers it received." In so doing, the district court ignored City Bank's status as an initial transferee and its consequent inability to rely on the safe harbor rule of 11 U.S.C. § 550(b)(1). Section 550 provides in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) [i.e., immediate or mediate transferees] of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550. City Bank offers no authority for the proposition that a bank which directly receives loan repayments is not an "initial transferee" within the meaning of section 550. It cites the case of *In re Greenbrook Carpet Co., Inc.*, 722 F.2d 659 (11th Cir.1984) for the proposition that the court's inquiry should focus on whether or not the debtor received adequate consideration in its transaction with the Bank, not on the ultimate use of the funds by the debtor.

Although *Greenbrook Carpet* is factually similar to the present case in many respects,[16] it is legally inapposite. The court

---

**15.** PID's creditors were deprived not only of the $500,000 ultimately paid to Hamilton and Plant, but also of $164,178.92 in interest payments, $114,508.92 of which went to City Bank in repayment of a loan which was guaranteed in large part by the Small Business Administration.

**16.** As in this case, the bank in *Greenbrook* lent money to a corporation with the knowledge that the corporation would immediately lend the money to the principal owners of the company who wanted to purchase stock. (In *Greenbrook*, however, the owners wanted to purchase a controlling block of stock in another carpet company.) The bankruptcy court found that while the bank was aware of the ultimate use to which the

in *Greenbrook* considered the substantive question of whether the loan repayments constituted fraudulent transfers within the meaning of 11 U.S.C. § 548; it was not presented with and did not consider the question of whether, assuming the transfers were avoidable under section 544, the bank would be an "initial transferee" within the meaning of section 550. Thus, while *Greenbrook*'s holding may have served as a proper basis for the district court to grant summary judgment to City Bank on the trustee's section 548 claims, it has no relevance to the question of City Bank's status as an initial transferee where the trustee avoids a transfer based on state substantive law coupled with section 544.

Cases such as *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1989) and *In re Bullion Reserve of North America*, 922 F.2d 544 (9th Cir.1991), are likewise unavailing. Unlike the purported transferees in those cases, who acted as conduits for a debtor's funds and exercised no dominion or control over the money, City Bank here received payments which it applied to extinguish a liability owed to it by the debtor. It exercised full control over the payments it received. City Bank was the initial transferee of approximately $363,000 in loan repayments by PID, and cannot rely on the safe harbor of section 550(b).

### E. *Recovery from Selling Shareholders*

The district court also granted summary judgment to the selling shareholders, concluding that they received their transfers in good faith and for value and thus came within the safe harbor of section 550(b)(1). The trustee asserts four different theories for recovery from the selling shareholders.

■ He asserts first that the initial transfers to various parties were for the benefit of the selling shareholders within the meaning of section 550(a)(1), thus taking them out of the safe harbor rule. This

argument is unavailing. Our recent opinion in *Bullion Reserve* makes clear that a "subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer." *Bullion Reserve*, 922 F.2d at 548–49 (citing *Bonded Fin. Servs. v. European American Bank*, 838 F.2d 890 (7th Cir.1988) (" 'Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language.' ")).

■ As to the $100,000 in deferred payments, the trustee asserts that the shareholders should be treated as initial transferees because ECR acted merely as a conduit. This argument also fails because ECR exercised full dominion and control over the "dividends" it received from PID and thus was a transferee within the meaning of § 550. *See Bullion Reserve*, 922 F.2d at 548–49; *Bonded Fin. Servs.*, 838 F.2d at 894.

The trustee's remaining two theories turn on whether the district court erred in deciding, on summary judgment, that the selling shareholders received their transfers in good faith and that the transaction was "above board." He argues that the transfers are recoverable from the selling shareholders, even if they are treated as mediate transferees under section 550(a)(2), because their actions were not taken in good faith. He also asserts that, as the court did in *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 500 (N.D.Ill.1988), we should " 'collapse' the interrelated transactions into one aggregate transaction which had the overall effect of conveying [PID] property to the tendering shareholders and the LBO lenders." All transfers would then be treated as initial transfers not subject to the safe harbor rule. These inquiries are essentially the same, as resolution of each involves consideration of the

---

funds would be put, it was not aware that the owners would not be personally liable on the loan to them, and that the relevant transfers between the bank and the company were "supported by fair consideration of a 'reasonably

equivalent value' " within the meaning of 11 U.S.C. § 548(a)(2)(A). On that basis, the district court held, and the appeals court affirmed, that the loan repayments did not constitute "fraudulent transfers" under section 548(a)(2).

knowledge and intent of the selling shareholders.

The cases dealing with whether LBOs are fraudulent conveyances suggest that courts' treatment of LBOs will depend on whether the transactions were "above board" in all relevant aspects or were intentionally fraudulent. *See Kupetz*, 845 F.2d at 847 (contrasting court decisions "ratifying" LBOs with decisions finding transactions to be fraudulent transfers). This is a case by case inquiry. *See id.*, 845 F.2d at 850 (refusing to find LBO was a fraudulent conveyance "in this case").

In *Kupetz*, we "decline[d] to use the law of fraudulent conveyances to force the selling shareholders in this case to give up the payments they have received." *Id.*, 845 F.2d at 847. Our decision there turned on four factors:

> First, there is no evidence of any intention on the part of the selling shareholders to defraud the corporation's creditors. Second, the selling shareholders did not know that [the purchaser] intended to finance the purchases through an LBO. Third, the Trustee represents no creditors whose claims against the estate arose before July 31, 1979, and who did not have full opportunity to evaluate the effect of the LBO on [the company's] creditworthiness. Fourth, the form of the transactions employed by the LBO reflects a sale by [the shareholders] to any entity other than [the company].

*Id.*, 845 F.2d at 847–48. Thus, we held that, "[w]hile we should not be understood as insulating all LBOs from fraudulent conveyance laws, we do affirm the district court's decision on the state fraudulent conveyance law claim and the § 548 claim in this case." *Id.*, 845 F.2d at 850.

Looking to the conduct and knowledge of the selling shareholders, in *Kupetz* we held that the "formal structure" of the LBO at issue should be respected. There, "the transaction bore the indicia of a 'straight' sale rather than the marks of a serial redemption by [the company] of its own stock. The Trustee's case would be stronger had the 'selling' shareholders known, or should have known, that their stock was being paid for by an asset depleting transfer by [the company]." *Id.* However, where there is evidence that the parties knew or should have known that the transaction would deplete the assets of the company, the court will look beyond this formal structure. *See Wieboldt*, 94 B.R. at 502 (analyzing *Kupetz* and *Tabor;* concluding that "[t]hese cases indicate that a court should focus not on the formal structure of the transaction but rather on the knowledge or intent of the parties involved in the transaction").

Thus, in *Wieboldt*, the court "collapsed" the interrelated transactions that effected the LBO into "one transaction," and allowed the debtor's efforts to recover the payments to certain shareholders to go forward. Finding that the debtor's complaint alleged that the company's board of directors and "insider shareholders" had known how the LBO would be financed and that the company was already insolvent and would be put in even worse condition by the LBO, the court refused to dismiss the complaint against the "controlling" and the "insider" shareholders. While the LBO had been carefully structured to insulate the participants from fraudulent transfer liability, the court looked behind this structure as to those defendants. However, as to other, non-insider shareholders (the "innocent pawns in the scheme"), the *Wieboldt* court refused to collapse the transactions, and impose liability on them. *Wieboldt*, 94 B.R. at 502–03; *see also Tabor*, 803 F.2d at 1302–03 (district court did not err in considering the series of LBO transactions as "one integrated transaction," where funds borrowed by the company merely "passed through" it to the purchaser and ultimately to the selling shareholders).

The materials submitted at summary judgment indicate that the selling shareholders in this case fall somewhere along the spectrum between the "innocent" *Wieboldt* shareholders and the controlling shareholders who were aware of the financial condition of the company and of the nature of the LBO and its effect on the company.

As indicated in the background section, *supra,* there was no direct evidence before the district court on summary judgment that Hamilton and Plant intended to defraud PID, knew that the buy-out was leveraged, knew that PID was liable on the $250,000 loan, or were aware that payments to them would come from anything other than paid-in surplus. There was evidence, however, that Plant and Hamilton knew or should have known of PID's undercapitalization, knew that some of Earl C. Russell's other companies were delinquent in paying amounts owed to PID, and were aware that PID legally could only purchase its shares out of earned surplus.

The district court granted summary judgment for the shareholders, finding that the trustee had failed to establish that any reasonable finder of fact could find that they knew or participated in any fraudulent or illegal transaction. The court concluded that there was "no *persuasive* evidence to suggest that Plant suggested or knew that PID's assets would be pledged, resulting in the leveraging" (emphasis added). However, as its use of the term "persuasive" suggests, in granting summary judgment, the district court appears to have weighed the evidence before it; this role is inappropriate at the summary judgment stage. The court's decision relies heavily on an affidavit by Plant, which supports its own ruling. However, the decision also lists evidence adduced or cited by the trustee that might support a contrary conclusion by a reasonable finder of fact. Thus, in view of the issues of fact raised by this conflicting evidence, summary judgment in favor of the shareholder was improper.

Moreover, our inquiry cannot stop with consideration of what the shareholders knew; we must also look at what they should have known. In *Kupetz,* we expressed "sensitivity" to the issue of the possible willed indifference of the selling shareholders, and noted that "in some circumstances [we] would find it of controlling importance." *Kupetz,* 845 F.2d at 848. In this case, we find the district court erred in granting summary judgment in favor of

the selling shareholders because there may have been evidence of actual knowledge it failed to consider or evidence that it should have considered as to whether the shareholders should have known how the transaction was structured, or whether they had a duty to investigate further under the circumstances.

We have recognized that "[i]n some circumstances ... controlling shareholders of a corporation are obligated to make certain that the business's creditors are not harmed by transactions in which the business enters." *Kupetz,* 845 F.2d at 848 n. 12 (citing *Pepper v. Litton,* 308 U.S. 295, 306–07, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939)). As corporate directors and officers, Plant and Hamilton owed a fiduciary duty to the corporation which included "undivided, unselfish and unqualified loyalty, unceasing effort never to profit personally at corporate expense, and unbending disavowal of any opportunity which would permit the director's private interests to clash with those of his corporation." *Lussier v. Mau–Van Development, Inc.,* 4 Haw.App. 359, 381, 667 P.2d 804 (1983).

In this case, the district court characterized Plant and Hamilton as "absentee owners" and found that there could be "no dispute that Plant and Hamilton exercised no authority, nor provided any consulting services after the date of the stock purchase." However, the extent of Plant's and Hamilton's involvement in PID's management prior to the buy-out was a matter of some dispute at summary judgment. Moreover, their duty to investigate and to keep informed as directors and controlling shareholders was not dependent on their actual participation.

In *Kupetz,* we concluded that under the circumstances present in that case, the controlling shareholders' failure to investigate the circumstances of the transaction did not defeat the district court's conclusion that they acted without knowledge and in good faith. However, the facts in *Kupetz* are distinguishable in several important respects from those before us here. In *Kupetz* the selling shareholder was aware of his company's solid financial health and

significant assets whereas Hamilton and Plant should have been aware that PID was undercapitalized. More importantly, "the Trustee [in *Kupetz*] never presented any evidence that a more thorough investigation would have turned up facts that would have put the selling shareholders on guard." *Kupetz*, 845 F.2d at 848 n. 11. Here, on the contrary, had the selling shareholders asked the most basic questions about the financing of the stock purchase, they might have learned that an already-undercapitalized PID was pledging all of its assets as security for half of the purchase price of their stock.

Whether the shareholders' failure to undertake any investigation amounted to such an abandonment of their duties as to vitiate a finding of good faith and to justify "collapsing" the series of transactions in this LBO turns on a number of disputed facts— e.g., whether PID actually was undercapitalized, whether the stock purchase rendered it insolvent, and what the shareholders had reason to know or inquire about. Because these genuine issues of material fact remain, the district court erred in granting summary judgment to the shareholders.

## CONCLUSION

The district court's refusal to enter the trustee's proposed form of judgment and denial of his motion to alter or amend judgment is AFFIRMED. We find, however, that the district court erred in holding on summary judgment that the trustee lacked standing to challenge pre-June 9, 1983 transfers and, specifically, to challenge the transfers to City Bank and the selling shareholders. We likewise find that the district court erred in applying the good faith test of 11 U.S.C. § 550(b)(1) to City Bank because it is liable as an initial transferee pursuant to 11 U.S.C. § 550(a)(1). Finally, because there was, at the time of summary judgment, a genuine issue of material fact as to what Hamilton and Plant knew or should have known as controlling shareholders, we conclude that the district

court erred in holding as a matter of summary judgment that Hamilton and Plant were entitled to the safe harbor of section 550(b)(1) and that the transaction should not be collapsed.

Accordingly, we REVERSE the district court's grant of summary judgment and REMAND for consideration of the collateral estoppel effect of the jury verdict. Specifically, the district court shall consider whether the trustee is bound by the jury's finding that Russell had no intent to defraud or conceal prior to June 9, 1983, thus depriving the trustee of standing to challenge any transfers prior to that date. The district court shall likewise consider the collateral estoppel effect on City Bank and the selling shareholders of the jury's finding that the transaction amounted to a voidable indirect purchase by PID of its own shares in violation of H.R.S. § 416-28.