In re OXFORD HOMES, INC., Debtor.

Joseph V. O'DONNELL,
Trustee, Plaintiff,

v.

ROYAL BUSINESS GROUP, INC.,
Real O. Roy and Prime Power,
Inc., Defendants.

Bankruptcy No. 94–20135.
Adv. No. 95–2011.

United States Bankruptcy Court,
D. Maine.

March 29, 1995.

Robert J. Keach, Bernstein, Shur, Sawyer & Nelson, Portland, ME, for plaintiff Joseph O'Donnell.

Gerald F. Petruccelli, Petruccelli & Martin, Portland, ME, for defendants Royal Business Group, Inc., Real O. Roy and Prime Power, Inc.

### MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JAMES B. HAINES, Jr., Bankruptcy Judge.

In this adversary proceeding the plaintiff, Chapter 11 trustee Joseph V. O'Donnell, has filed a twenty count amended verified complaint against the defendants, seeking recovery for, among other things, funds transferred to the defendants in connection with a leveraged buyout of one hundred percent of the outstanding stock of Oxford Homes, Inc. ("Oxford" or "debtor"), in a transaction consummated approximately seven months before Oxford's bankruptcy filing. Insofar as pertinent here, the complaint asserts that the $1,600,000.00 paid to Royal Business Group,

Inc. ("Royal") constituted a fraudulent transfer under both state and federal law.

Before the court today is the plaintiff's motion for preliminary injunctive relief against Royal and Real O. Roy ("Roy"), Royal's president and a former officer of the debtor.[1] For the reasons set forth below, a preliminary injunction shall issue, albeit of a less comprehensive scope than plaintiff's request.[2]

## DISCUSSION

In order to determine the plaintiff's entitlement to the relief he seeks, I must evaluate the record in view of the standards governing issuance of a preliminary injunction. I will first outline the plaintiff's claims, then proceed to consider those claims under the pertinent standards, treating the defendants' contentions within that analysis.

### A. *The Plaintiff's Case.*

On the record before me [3] the plaintiff has demonstrated a likelihood that he can prove the following facts at trial.[4]

Royal purchased Oxford's assets in late 1989 or early 1990 for $900,000.00. It subsequently invested another $425,000.00 in the business. At the culmination of the acquisition, Royal became Oxford's sole shareholder.

After amending its articles of incorporation on January 25, 1991, Oxford conducted business as a closely held corporation under Maine law, managed by its shareholders, rather than by a board of directors. *See* 13–A M.R.S.A. § 701(2). Royal remained Oxford's sole shareholder. In turn, Roy controlled Royal.

Between 1990 and 1993, Roy was Oxford's chief executive officer. From August 1991 until January 1993, Roy devoted virtually all his time and attention to Oxford's business. In early 1992, Roy hired Connell to be president, but continued to run the "financial side and day-to-day operations" of Oxford. Roy Affidavit at ¶ 14.

In late 1992, Connell expressed an interest in purchasing all of Oxford's stock from Royal. In January 1993, Connell and Royal entered into a stock purchase agreement by which Royal agreed to sell its Oxford stock to Connell for $1,600,000.00. Between January and closing on the stock transfer in late July 1993, Connell took over the company's business operations.[5]

Connell retained the services of an investment banker, Roberts Hackett & Co. ("Roberts Hackett") to assist him in raising the funds required for the stock purchase. In early 1993, Connell and a co-investor, Jeffrey Newsom, incorporated O.H., Inc. ("O.H.") for

---

1. Plaintiff seeks no such relief against Prime Power, Inc. Accordingly, future references to the "defendants" include Roy and Royal only.

2. This memorandum sets forth the court's findings of fact (for the limited purpose of determining the plaintiff's entitlement to interlocutory relief) and conclusions of law in accordance with Fed.R.Bankr.P. 7052, 9014. *See* Fed.R.Bankr.P. 7065 (substantially incorporating Fed.R.Civ.P. 65).

 References to statutory sections or to the "Code" refer to the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101, *et seq.*, as amended.

3. The record includes a transcript of the deposition of Peter N. Connell, currently the president and chief executive officer of Oxford, with exhibits; plaintiff's verified complaint and amended verified complaint, the factual allegations of which have been attested to by Mr. Connell; the affidavit of Defendant Real O. Roy; the affidavit and testimony of Karen Hill, supervisor of accounting for Oxford for the years 1980–83 and 1986 through the present; the letter report of Ernst & Young, L.L.P., dated November 17,

1994; and the July 30, 1993 balance sheet of Oxford, reviewed by the certified public accounting firm of Austin Associates, P.A. The plaintiff objected to consideration of the Austin Associates report at trial, but I have considered it nonetheless.

4. The plaintiff seeks issuance of a preliminary injunction under §§ 548 and 105(a) of the Bankruptcy Code and under state fraudulent transfer law, 14 M.R.S.A. §§ 3575, 3578. Accordingly, the textual discussion focuses on evidence pertinent to the fraudulent transfer counts of the plaintiff's complaint only.

5. The stock purchase agreement also required Oxford to pay substantial monthly fees to Royal and related entities until the stock purchase closed. Oxford made the payments. Although the plaintiff challenges those payments under other counts of his complaint, they are not at issue here. The fact that they were made does, however, relate to Oxford's financial health when the transaction closed.

the sole purpose of acquiring Oxford's stock. Connell, who had paid Royal a $160,000.00 deposit under the stock purchase agreement, assigned his interest in the agreement to O.H., receiving 87.7% of O.H.'s common stock. Newsom invested $100,000.00 in O.H., receiving in return 12.3% of its common stock.

With the aid of Robert Hackett, Connell planned to raise a substantial portion ($1,500,000.00) of acquisition funds through a private offering of O.H. preferred stock.

The private placement memorandum circulated to potential O.H. investors explained the terms of the deal as a leveraged buyout ("LBO") and reverse merger under which O.H. would acquire the Oxford stock and, immediately thereafter, be merged into Oxford, with Oxford surviving. Initial investors would receive O.H. stock with the understanding that it would be converted to Oxford stock at or after closing. Those who invested after the merger would receive Oxford stock directly. The offering memorandum cautioned that if less than $1,500,000.00 was raised through the private offering, borrowed funds would be used to purchase the Oxford stock, leaving Oxford substantially leveraged and increasing dramatically the chance of investment loss.

At the same time as they pursued the stock offering, Connell and Roberts Hackett went to work arranging credit. They knew that, should the stock sale fall short, borrowed money would fund O.H.'s purchase of Oxford's stock and pay fees associated with that transaction.

To make a long story short, the private placement yielded only $600,000.00. Connell negotiated for Oxford a $780,000.00 mortgage on its Oxford, Maine real estate which, after paying off the first mortgage, yielded approximately $190,000.00. Oxford obtained a $550,000.00 advance on what was to be a $1,500,000.00 asset-based credit line from Roberts Hackett, secured by Oxford's accounts receivable and inventory.[6] Oxford also obtained a $150,000.00 loan from Advantage Business Services, Inc. ("Advantage"), a Roberts Hackett affiliate, and secured the obligation with a first security interest in machinery and equipment.

When the stock transfer closed, all of the funds borrowed by Oxford, as well as the Connell, Newsom and preferred stock investments in O.H., were paid out. According to Connell's uncontradicted testimony, Oxford paid $1,600,000.00 plus accrued "fees"[7] to Royal.[8] Royal transferred its 100% holdings in Oxford to O.H. (*not* to the debtor). In return for the funds it paid, Oxford received nothing.[9]

The buyout went forward according to plan in most respects. O.H. and Oxford merged, with Oxford surviving. Connell and Newsom's O.H. stock was converted to Oxford common stock and the private placement investors received Oxford preferred stock.

Oxford had experienced operating cash shortages even before the leveraged buyout closed. Shortly before the closing, Connell borrowed $40,000.00 which was used, among other things, to meet Oxford's payroll. Consummation of the buyout did not help mat-

---

6. The face amount of the line of credit was $1,500,000.00. However, it was never funded or drawn upon to that extent.

7. *See supra* n. 4.

8. The exact disposition of funds at closing is not apparent. Suffice it to say that substantial sums were paid to third parties as fees and costs. There is no dispute that Royal received, in total, $1,600,000.00 for its stock.

9. The complaint alleges that:

[W]hile the transactions may have been documented as a transfer of funds from the Debtor to O.H. followed by the transfer of funds from O.H. to Royal in exchange for the Debtor's stock, as part of the leveraged buyout and reverse merger, O.H. did not in fact receive any such funds and/or O.H. was at all times a mere conduit of such funds or a "straw man", and payments made to Roy and/or Royal were in fact direct transfers of the Debtor's assets ... for which transfers the Debtor received no consideration.

Amended Verified Complaint at ¶ 41. Connell's testimony supplements the complaint's equivocal language. He testified that O.H. never received any funds (from the stock offering or from Oxford's borrowings); that it never had any books, records or bank accounts; that it did not function even as a "conduit" at closing; and that payments made at closing were made by Oxford directly. Connell Dep. at 98–100.

ters. Within thirty days of the closing, Connell was once again putting additional funds into Oxford.[10] Although the Advantage line of credit was eventually funded to approximately one million dollars, Oxford floundered. In January 1994, Oxford borrowed $225,000.00 from Connell and Hackett to cover overdrafts in its payroll and operating accounts. In February 1994, Oxford filed for relief under Chapter 11.

### B. *Preliminary Injunction Standard.*

The First Circuit has instructed that:

In deciding whether to grant a preliminary injunction, a district court must weigh the following four factors:

(1) The likelihood of the movant's success on the merits;

(2) The potential of irreparable harm to the movant;

(3) The balancing of the relevant equities, *i.e.,* "the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld," *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991); and

(4) The effect on the public interest of a grant or denial of the injunction. *See, e.g., Id.* However, the "*Sine qua non* of [the preliminary injunction standard] is whether the plaintiffs are likely to succeed on the merits." *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993). *See also United Steelworkers of America v. Textron, Inc.,* 836 F.2d 6, 7 (1st Cir.1987) ("The heart of the matter is whether 'the harm caused the plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual successful on the merits, outweighs the harm the injunction will cause defendants.'")

10. Between the LBO closing and Oxford's bankruptcy filing, Connell injected approximately $171,213.72 into Oxford by way of investments or loans.

11. Section 544(b) provides that:
The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
The amended verified complaint avers that:

(quoting *Vargas–Figueroa v. Saldana,* 826 F.2d 160, 162 (1st Cir.1987) (emphasis in original)).

*Gately v. Commonwealth of Massachusetts,* 2 F.3d 1221, 1224–25 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).

■ Injunctions are equitable remedies with significant consequences. They should be " 'used sparingly and only in a clear and plain case.' " *Georgia–Pacific Corp. v. Great Northern Nekoosa Corp.,* 727 F.Supp. 31, 32 (D.Me.1989) (quoting *Stanton by Stanton v. Brunswick School Department,* 577 F.Supp. 1560, 1567 (D.Me.1984)).

### C. *Applying the Standard.*

### 1. *Likelihood of Success on the Merits.*

#### a. *Substance of the Fraudulent Transfer Counts.*

■ As Oxford's bankruptcy trustee, the plaintiff may employ a state law cause of action under § 544(b) of the Bankruptcy Code.[11] Maine's version of the Uniform Fraudulent Transfer Act provides that the following transfers are deemed fraudulent as to existing and subsequent creditors:

**1. Fraudulent Transfer.** A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

**A.** With actual intent to hinder, delay or defraud any creditor of the debtor; or

**B.** Without receiving a reasonably equivalent value in exchange for the transfer or obligations and the debtor:

As of the Filing Date, the Debtor had trade debts outstanding of over $1.6 million dollars representing over 57 trade creditors, and had other unsecured debt of over $400,000.00. The majority of these trade creditors were also trade creditors at the time of the LBO, and several creditors held claims prior to the closing of the LBO which remained unpaid at the Filing Date.
Amended Verified Complaint at ¶ 45. Defendants do not challenge the plaintiff's standing to commence a § 544(b) action.

(1) Was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.

14 M.R.S.A. § 3575. A successful creditor might obtain relief including avoidance of the transfer or obligation, appointment of a receiver, damages or "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property...." 14 M.R.S.A. § 3578(1)(A), (C). Pending final judgment, the creditor may obtain provisional remedies against "the asset transferred or other property of the transferee...." M.R.S.A. § 3578. Transfers made to entities that took in "good faith and for a reasonably equivalent value" or to persons who took subsequent to such a transfer are not avoidable. 14 M.R.S.A. § 3579(1). Good faith transferees are protected to the extent they gave value to a debtor. 14 M.R.S.A. § 3579(4).

As to transfers made within one year before bankruptcy, the Code itself provides the trustee with a cause of action substantially similar to that provided by state law:

### § 548. Fraudulent Transfers and Obligations.

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) Made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) Received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) Was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) Was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) Intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a). The successful § 548 plaintiff may recover the property transferred, or the value of such property, from the initial transferee, from the entity for whose benefit the transfer was made or any immediate or mediate transferee of the initial transferee, subject to qualifications as to transferees who take for value or in good faith. 11 U.S.C. § 550(a), (b). Good faith transferees who gave value are protected to the extent they gave value to the debtor. § 548(c).[12]

Here the transaction under scrutiny took place well within one year of Oxford's bankruptcy petition. Thus, both § 548 and state law provide grounds for its avoidance.

#### b. *LBO's and Fraudulent Transfer Principles.*

■ Without question, the transaction by which Connell and Newsom obtained all of Oxford's common stock constituted an LBO.

A leveraged buyout refers to the acquisition of a company (target corporation) in which a substantial portion of the purchase price paid for the stock of the target corporation is borrowed and where the loan is secured by the target corporation's assets. Commonly the acquirer invests little or no equity. Thus, a fundamental feature of leveraged buyouts is that equity is exchanged for debt.

*Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 645 (3rd Cir.1991), *cert. denied sub nom. Committee of Unsecured Creditors v. Mellon Bank, N.A.,* 503

---

**12.** Recovery against initial transferees, as well as against subsequent transferees, under § 548 and § 544(b) via state law is governed by § 550. *See* § 550(a).

U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992).

The Oxford LBO is atypical in several respects. First, the acquirers did invest some (albeit not enough) equity. However, the new capital was devoted exclusively to liquidation of the selling shareholder's interests, adding nothing to Oxford's working capital. Second, and equally significant, the transfer from Oxford to the selling shareholder was direct—Oxford's funds were not funnelled through an intermediary. Royal was, in the parlance of § 550(a), Oxford's "initial transferee."

■ Regarding fraudulent transfer policy, this court has observed:

The purpose of voiding transfers unsupported by "reasonably equivalent value" is to protect creditors against the depletion of a bankrupt's [sic] estate. 11 U.S.C. § 548(a)(2); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829–30 (5th Cir. 1959), *cert. denied,* 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960). Therefore, this provision does not authorize voiding a transfer which "confers an economic benefit upon the debtor," either directly or indirectly. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2nd Cir.1981). In such a situation, "The debtor's net worth has been preserved," and the interests of the creditors will not have been injured by the transfer. *Id.*

*Marquis Products, Inc. v. Conquest Carpet Mills, Inc. (In re Marquis Products)*, 150 B.R. 487, 490 (Bankr.D.Me.1993) (quoting *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990) (footnote omitted)). Generally speaking, the transferor receives less than a reasonably equivalent value when it transfers property in exchange for consideration that passes to a third party. *Id.* at 491. *See BFP v. Resolution Trust Corp.*, —— U.S. ——, ——, 114 S.Ct. 1757, 1760, 128 L.Ed.2d

556 (1994) (outlining elements of § 548 fraudulent transfer recovery); *In re Marquis Products, Inc.*, 150 B.R. at 490 (same).

■ Fraudulent transfer law may be appropriately applied to LBO's. *See, e.g., Moody v. Security Pacific Business Credit,* 971 F.2d 1056 (3d Cir.1992); *Lippi v. City Bank,* 955 F.2d 599 (9th Cir.1992); *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d at 645; *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 500 (N.D.Ill.1988) (collecting cases); *In re Consolidated Capital Equities Corp.,* 143 B.R. 80, 86–87 (Bankr. N.D.Tex.1992); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127 (Bankr.D.Mass.1989). *See generally* 4 Queenan, Hendel and Hillinger, *Chapter 11 Theory and Practice: A Guide to Reorganization* §§ 27.01–27.04 (1994) [hereinafter "*Queenan, Hendel & Hillinger*"]; 3 *Norton Bankruptcy Law and Practice 2d* § 58A:7 (1994) [hereinafter "*Norton*"].

■ Whether a transaction is within or without the purview of fraudulent transfer principles is a function of its own facts and the applicable law. Labeling a transaction as an LBO does not immunize it from scrutiny. The first question must always be, "Does the statute apply?" *See United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1297 (3rd Cir.1986), *cert. denied sub nom. McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).[13]

The Oxford LBO bears the hallmarks of a classic fraudulent transfer. Oxford parted with substantial funds. It received nothing in return. Immediately after the transfer, it ran out of cash and, within seven months, filed for bankruptcy protection.

### c. Addressing Defendants' General Contentions.

Defendants Royal and Roy argue that fraudulent transfer analysis cannot appropri-

---

13. The proposition, urged by the defendants here, that fraudulent transfer principles were not intended to apply, and therefore should not be applied to sophisticated commercial transactions, has been "almost uniformly" rejected by the courts. 3 *Norton* § 58A:7 at 58A–10, 58A–11. *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988), and *Credit Managers Association of Southern California v. The Federal Co.,* 629 F.Supp. 175, 181 (C.D.Cal.1985), cited by defendants, do not hold that fraudulent transfer law cannot be applied to LBO's. *Kupetz* reaches a fact-driven conclusion that such principles should not be applied to the case before it. 845 F.2d at 847–48. *Credit Managers,* while expressing policy concerns on the point, does not reach the issue. 629 F.Supp. at 181.

ately be employed "to implement a retrospective disapproval of an organic business transaction effecting a change of ownership of a corporate Debtor." Defendants' Memorandum in Opposition to Plaintiff/Trustee's Motion for Preliminary Injunction at 3. They complain that, were the trustee to succeed, the door would be open to suits by unhappy creditors who, once willing to bet on the success of an LBO, seek to realize their losses from any available deep pockets when things don't, in the end, work out.

But such is hardly the case here. Oxford's finances were infirm before the LBO. They fell apart immediately thereafter. This is not a case in which the debtor properly functioned financially for any period following the LBO. Cf. Kupetz v. Wolf, 845 F.2d at 844 (twenty-nine months between LBO and bankruptcy); Credit Managers Association of Southern California v. The Federal Co., 629 F.Supp. at 178 (seventeen months between LBO and assignment for benefit of creditors).

Nor is the plaintiff suing only on behalf of creditors who came on the scene after the fact. Cf. Kupetz v. Wolf, 845 F.2d at 849 (no existing creditors with claims predating LBO). Some of the debts Oxford owed before the LBO remained owing when it filed its bankruptcy petition.

Defendants also assert that, by attempting to shoehorn the stock transfer transaction into a fraudulent transfer mode, the trustee has disregarded "statutory limitations and elements, to advance his theory of single 'collapse' of the transaction." They complain that the trustee's theory of recovery "cannot with a straight face be called statutory construction and application...." Defendants' Memorandum at 4.

But "collapsing" the Oxford LBO will not be required for the trustee to prevail here. Cf. Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. at 502 (collapsing multi-tiered LBO into a single, integrated transaction in light of parties' knowing attempt to structure transaction to avoid fraudulent conveyance liabili-

ty). Here, the record reveals that the debtor, Oxford, paid substantial sums directly to Royal at closing. Oxford received nothing in return. It is unnecessary to trace Oxford property through third parties' (be they straw men, conduits or pipelines) hands.[14] Our case is straightforward.

The defendants also aver that others (e.g., lenders, Connell, Newsom, O.H.) are the proper targets for the trustee. They assert that the terms of Oxford's confirmed reorganization plan have unfairly insulated such others from attack, and that the trustee may not now move against them while ignoring the real culprits. That simply isn't so. Defendants overlook the reality that consent should be the essence of reorganization and that in the process of negotiating a consensual plan (as was accomplished in this case) some fraudulent transfer claims may be compromised (as was done here). 4 Queenan, Hendel & Hillinger § 27.01 at 27:3. Oxford's plan preserved this fraudulent transfer claim for the benefit of its creditors. Defendants have demonstrated no reason why release or compromise with others should bar this action.

In sum, the defendants' general arguments simply reflect (a) a misapprehension of pertinent legal principles, (b) mischaracterization of the facts or (c) an overwhelming desire that the trustee pursue someone else, rather than them. Having concluded that the Oxford LBO is an appropriate subject of fraudulent transfer analysis, I will turn to a brief, element by element review of the plaintiff's claims against each of the defendants.

d. *Fraudulent Transfer Elements Applied.*

*Transfer.* The record discloses that as part of the July 1993 LBO closing, the debtor transferred substantial funds to Royal. The plaintiff asserts that all of the $1,600,000.00 Royal received was Oxford's property. But a close look reveals otherwise. The O.H. private offering accounted for $600,000.00 of the funds paid Royal. Anoth-

14. This is not to say that a complex LBO may not be collapsed into a single, integrated transaction for purposes of fraudulent transfer analysis in the proper case. See Lippi v. City Bank, 955 F.2d at

611–12 (discussing propriety of collapsing the transaction in view of factors such as selling shareholders' knowledge and their duties to the debtor corporation and its creditors).

er $160,000.00 came from Connell personally. Similarly, Newsom paid $100,000.00.

■ The funds may have passed through Oxford's accounts on their way to Royal. However, the terms of the private offering (a sale of O.H. preferred stock) and of the Connell and Newsom contributions (paid for O.H. common stock) demonstrate that Oxford never had "dominion or control" over those funds. To the extent that such funds may have passed through Oxford, it acted merely as a "financial intermediary" for the O.H. investors. They were never "transferred" to it. *Cf. In re Bullion Reserve of North America*, 922 F.2d 544, 549 (9th Cir.1991) (defendant who received funds without the ability to put them to his own purposes was not a "transferee"); *Bonded Financial Services v. European American Bank*, 838 F.2d 890, 893 (7th Cir.1988) (bank which received funds with binding instructions to apply them for another's benefit was not a "transferee"). *Cf. also Lippi v. City Bank*, 955 F.2d at 610–11 (bank which received funds and applied them to satisfy an obligation owed it by a third party was a "transferee").[15] Thus, it appears that $740,-000.00 of Oxford's funds flowed to Royal in the LBO.

■ *Value in Exchange.* Defenses available under both state and federal law provide that a good faith transferee will be protected (by retaining a lien on the transferred property or otherwise) to the extent of value given *to the debtor* in exchange for the transfer. § 548(c); 14 M.R.S.A. § 3579(4). Oxford received no value from Royal (or, for that matter, from anyone else) in exchange for its $740,000.00 payment. Defendants' claim that Royal "gave value" when it invested in Oxford years before the LBO is specious. To accept the argument would be to license any liquidation of investment at any

time, creditors be damned. Our focus must be on the characteristics of the July 1993 transaction.

■ *Insolvency.* At the time of the LBO, Oxford may not have been insolvent in the balance sheet sense. Although the Austin Associates report dated July 30, 1993, has been criticized by the trustee, it provides some evidence that, immediately following the LBO, Oxford's assets exceeded its liabilities. *See* § 101(32)(A). But the plaintiff may succeed if, on the date of the transfer, Oxford was insolvent in the equitable sense, *i.e.*, § 548(a)(2)(B)(iii) (unable to pay debts as they "matured"); 14 M.R.S.A. § 3575(1)(B)(2) (unable to pay debts as they "became due"), or left with unreasonably small capital for its existing and planned business activities. § 548(a)(2)(B)(ii); 14 M.R.S.A. § 3575(1)(B)(1). *See Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d at 1070 (explaining difference between and content of the standards and concluding that the "unreasonably small capital" standard comprehends financial difficulties less severe than equitable insolvency); *In re Vadnais Lumber Supply, Inc.*, 100 B.R. at 137.

■ Karen Hill's affidavit and testimony establish that before, during and after the LBO, Oxford's cash flow was strained to the breaking point. In the face of Ms. Hill's specific and compelling testimony, as well as Connell's consistent testimony, the defendants offer up only Mr. Roy's conclusory affidavit to the effect that, between January and July 1993, Oxford "had its largest backlog of orders ever and had reasonably good cash flow." Roy Affidavit at ¶ 11. The situation went far beyond "stretching the payables" as the defendants would have it. Oxford was plainly unable to pay its obligations as they came due. I conclude that the trust-

---

15. In the usual case, operation of the "mere conduit" principle operates to the detriment of defendants who seek to defend fraudulent transfer actions by contending that they were not an "initial transferee." *See, e.g., Wieboldt v. Schottenstein*, 94 B.R. at 502–03. Here the principle applies to define and limit the extent of Oxford's property that was transferred to these defendants in the LBO.

The trustee notes that more than $1,600,000.00 was paid out at closing when one takes into account closing costs and fees. Nevertheless, when one considers the purposes for which the Connell, Newsom and private placement investor funds were tendered, it is inappropriate at this stage to allocate them to expenditures other than stock acquisition from Royal. To do so would, of course, increase the extent of Oxford property in the mix and potentially increase the recovery that might be had from Royal.

ee has demonstrated a reasonable likelihood of demonstrating that Oxford had unreasonably small capital and was equitably insolvent at the time of the LBO.

 *Transferee Defenses:* As discussed above, Royal was Oxford's direct transferee. As such, notwithstanding its contrary view, a "good faith" defense is not available to it.[16]

As to Roy, there is no evidence that he received either an initial transfer from Oxford or a subsequent transfer from Royal. Although it may well be that, as the person in control of Royal, Roy might later be determined to be an "entity for whose benefit" Oxford's initial transfer to Royal was made, § 550(a)(1), the parties have not addressed the issue and it is, for now, unnecessary for me to reach it.[17]

 *Summing Up.* I conclude that the plaintiff has demonstrated a reasonable likelihood of prevailing on the merits to the extent that Oxford transferred $740,000.00 to Royal, without consideration; that the transfer left Oxford equitably insolvent and with unreasonably small capital for its business; and that Royal, as Oxford's initial transferee, will be liable to remit that sum to Oxford.

## 2. *Irreparable Harm.*

 Of the preliminary injunction factors, the question whether plaintiff will be irreparably harmed should an injunction not issue presents the closest question. Nevertheless, I conclude that, absent an injunction, the plaintiff faces harm warranting interlocutory equitable relief.

Plaintiff argues that Royal holds Oxford's money and that, should Royal disburse that money to its principals or use it to speculate in a risky venture, his chances of meaningful recovery will be diminished or eliminated. Defendants, acknowledging that Royal is in the business of investing in other enterprises, argue that the funds are safe with Royal, that Royal has no present plans to part with them and that, in any event, plaintiff's claims are "only for money" and, therefore, that they do not warrant equity's protection.

There is precedent supporting the trustee's argument. In *In re DeLorean Motor Co.*, the Sixth Circuit affirmed the bankruptcy court's injunctive order issued to protect assets likely to have been fraudulently transferred from the bankruptcy estate, pending investigation and litigation aimed at securing their return. 755 F.2d 1223, 1231 (6th Cir. 1985). The court expressly distinguished such injunctive relief from the attachment process, 755 F.2d at 1227, noting that the injunction issued pursuant to § 105(a) was to protect assets in which the estate had an interest, rather than to "secure satisfaction of the judgment to be entered. . . ." *Id.*

In *DeLorean* the defendants had allegedly used estate funds to acquire another company. The court was presented with evidence that the defendants were about to sell that company. 755 F.2d at 1225. Its order, issued pursuant to § 105(a), enjoined the defendants from disposing of anticipated sale proceeds and directed that such proceeds be deposited in escrow.

In contrast, there is no threatened or impending disposition of the assets at issue in

16. In pertinent part, § 550 provides that the trustee may recover the value of the transferred property from "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of such initial transferee." § 550(a). Transferees who are one or more steps removed from the initial, voidable transfer are protected by the provisions of § 550(b) to the extent they received the property from the initial transferee for value and in good faith or to the extent they took in good faith from a subsequent transferee. § 550(b).

 Even were I to conclude that bad faith is required to recover from Royal, there is a high likelihood that the trustee can demonstrate that it

was present here. There is ample evidence that, as president of Royal, Oxford's sole shareholder and, under state corporation law, its director, Roy was intimately familiar with Oxford's finances and knew, or, at least, reasonably should have known, the details of the LBO and its affect on Oxford. *See, e.g., Lippi v. City Bank*, 955 F.2d at 613–14 (discussing factors relating to issues of shareholder good faith as it relates to LBO/fraudulent transfer liability).

17. At the preliminary injunction hearing, counsel agreed that Royal continues to hold substantially all of the funds it received in the LBO. There is no evidence to suggest that Roy personally has yet received a dime.

this case. Moreover, the defendants have not shown a predisposition to fraud or squander. *Cf. EBSCO Industries, Inc. v. Lilly,* 840 F.2d 333, 336 (6th Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988) (defendants' fraudulent conduct considered in support of issuing injunction).

■ The transferred assets are, however, already in liquid form and, therefore, deserving of special protection. The Code acknowledges that cash and cash equivalents are highly susceptible to diversion and loss. When such assets are encumbered, it excepts them from the general rule that a debtor authorized to conduct business may employ its property in the usual course. *See* § 363(c)(2) (enjoining use of cash collateral without court order or creditor consent).

■ Section 105(a) provides the bankruptcy court with authority to issue any order "that is necessary or appropriate to carry out the provisions of this title." When a fraudulent transfer defendant holds cash or cash equivalents shown with reasonable likelihood to be the estate's, it is appropriate and, in a given case may be necessary, that the court issue a form of provisional order, injunctive or otherwise, to ensure that a judgment ordering their return will be meaningful. *DeLorean,* 755 F.2d at 1230.

■ State law, too, contemplates the propriety of issuing an injunction to protect a debtor's right to recover fraudulently transferred assets. It provides that a court may issue an "injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property" and that "other relief" may issue as "the circumstances ... require." 14 M.R.S.A. § 3578(1)(C). The statute expressly authorizes issuance of such an order on a provisional basis. 14 M.R.S.A. § 3578(1)(B).

■ In this case, legal process such as attachment is an unsatisfactory substitute for an appropriately tailored injunction. Royal is a New Hampshire corporation. The location of its assets is unclear, but they are concededly not within Maine.[18] Issuing an order for attachment would be of no immediate effect and, ultimately, if of any use at all, of little practical effect.[19] An injunction will operate immediately and *in personam* to safeguard the assets at issue. *See EBSCO Industries v. Lilly,* 840 F.2d at 336 (inadequacy of attachment is a factor supporting issuance of injunction).

All things considered, plaintiff has demonstrated the degree and character of potential harm necessary to warrant interlocutory injunctive relief under § 105(a) and 14 M.R.S.A. § 3578(1)(C). But the character of potential irreparable harm is limited: loss or transfer of $740,000.00 paid to Royal by Oxford. The scope of the injunction to issue will be limited accordingly.

### 3. *Balance of Hardships.*

■ Should the injunction not issue, the plaintiff's ability to obtain a return of liquid and easily transferred assets is jeopardized. Defendants argue that, because Royal's business is one of acquiring businesses and making investments, an injunction tying up the funds the trustee seeks to recover will impermissibly freeze its activities, essentially putting its affairs on hold until the litigation ends.

I conclude, however, that the balance of hardships favors issuing an injunction. First, Royal's protests were initially made in view of the trustee's demand that $1,600,000.00 be protected pending judgment. My conclusion that the trustee has demonstrated a likelihood of success only to the extent of $740,000.00 diminishes the potential impact of the injunction by more than half. Second, because there is no evidence that Roy holds any of the funds, and because, as an officer of Royal he must abide by an injunction directed at Royal and its assets, the injunction will not operate against him personally. Third,

---

18. Roy recently executed an affidavit in Wyoming. The limited information in the record to date leads to the conclusion that Royal's business is conducted just about wherever Roy may be.

19. *See* Fed.R.Civ.P. 64 (attachment available in accordance with state procedures). Maine's attachment laws, 14 M.R.S.A. §§ 4101, 4102, 4151 *et seq.,* and procedures, Me.R.Civ.P. 4A, are without extraterritorial effect. Securing attachments on assets located in other states would be a time consuming, cumbersome, hit-or-miss process.

**14**

the injunction will be tailored to operate in a fashion that minimizes, insofar as possible, disruption of Royal's business.

### 4. *Public Interest.*

■ Aside from the public interest reflected in bankruptcy laws aimed at recovering fraudulently transferred assets and distributing them among creditors, the public interest is not bound up in today's decision.

The defendants assert that an injunction threatens public policy that "permits leveraged buyouts to occur as legitimate transfers of value" and that issuing an injunction "would have a chilling effect on the willingness of participants in many business transactions to proceed." But the defendants' condemnation of preliminary injunctions in the LBO context is overbroad. LBO's that do not liquidate equity holdings in a fashion that immediately sacrifices the interests of the corporation and its creditors are not threatened by court action in this case. Neither will an injunction "chill" legitimate (as defined by, among other things, fraudulent transfer laws) business activity. Thus, to the marginal extent that the public interest is implicated, it supports issuing an appropriate injunction.

### 5. *Conclusion.*

For the reasons set forth above, I conclude that a preliminary injunction to ensure against transfer, waste or loss of $740,000.00 in Oxford LBO proceeds held by Royal shall issue. I will address the appropriate form and content of the injunction below.

### D. *Fashioning the Injunction.*

The trustee requests a broad injunction:

a) enjoining the defendants from transferring, encumbering or otherwise disposing of the assets transferred to them by Oxford;

b) enjoining the defendants from transferring, encumbering or otherwise disposing of any other assets other than in the ordinary course of business or their respective personal affairs; and

c) ordering the defendants to make full disclosure of all their assets and liabilities; to disclose the location of all their assets, including the assets transferred to them by Oxford; and requiring them to report monthly regarding all transactions affecting their assets.

■ I agree with the defendants that the requested injunction is too broad. First, for reasons set forth above, only Royal will be enjoined. Second, Royal will be enjoined only to the extent necessary to protect the $740,000.00 that will likely be shown to have been received from Oxford in a voidable transfer. In light of the limited injunction that I will order, I will not, as defendants request, require the plaintiff to post a bond. *See* Fed.R.Bankr.P. 7065 (providing that the bond requirement of Fed.R.Civ.P. 65(c) need not apply to a debtor, a debtor-in-possession or a trustee).[20]

■ The limited function to be served by the injunction is to ensure that Oxford's $740,000.00 remains accessible. Indeed, the plaintiff does not care whether the same funds, or adequate substitute funds, are ultimately available. Thus, although the reasons for its issuance are somewhat different, the injunction will operate much the same way as would an attachment. Royal should be able to free up the funds it holds by posting adequate security in their stead.

For these reasons, an injunction will issue by separate order that will:

a) enjoin Royal, its officers, agents and assigns, from transferring, encumbering or otherwise disposing of $740,000.00 of the funds received in the LBO;

b) require Royal to account for such funds to the plaintiff; and

c) provide that Royal may obtain an order amending the injunction upon a showing that

---

**20.** The plaintiff may, under the terms of Oxford's plan, be deemed "a trustee." I recognize, however, that he is not a bankruptcy trustee in the usual sense. Nevertheless, he is acting pursuant to the confirmed plan of reorganization to prosecute this action on behalf of Oxford's unsecured creditors. Under these circumstances, the same reasons as would relieve a pre-confirmation trustee from the bonding requirement obtain. The plaintiff was Oxford's Chapter 11 trustee and presently is Oxford's "plan trustee," administering assets post-confirmation for the benefit of Oxford's creditors.

it has either (1) placed $740,000.00 in a federally-insured escrow account where the funds will earn interest at a reasonable rate pending entry of judgment in this matter or (2) obtained a bond in the amount of $800,000.00 to satisfy such judgment (including pre-judgment interest) as may enter in this case.

## CONCLUSION

For the reasons set forth above, a preliminary injunction consistent with the provisions of this memorandum of decision shall issue separately forthwith.